| 76 | 103 |
| f77 | 84 |
| f77 | 137 |

| 76 | 103 |
| f78 | 804 |
| 79 | 594 |

THE KANSAS CITY, MEXICO & ORIENT RAILWAY
COMPANY V. EDWARD H. LOOSLEY.

No. 15,088.   (90 Pac. 990.)

SYLLABUS BY THE COURT.

1. INSTRUCTIONS—*Defective Request for a Proper Instruction.*
If a defective request for an instruction actually brings to
the attention of the court an important principle of law
which ought to be stated to the jury in order that they may
render an intelligent verdict, it may be prejudicial error to
disregard it; and if an attempt be made by an instruction
given to submit to the jury the matter defectively covered by
the request it should be sufficiently explicit and comprehensive
to cover fairly the field of the request.

2. MASTER AND SERVANT—*Assumption of Risk.* It is the duty
of a master to make the conditions of his servant's work rea-
sonably safe. One of the conditions is that the servant be
furnished with reasonably careful coservants. But if the
master fail in the performance of this duty the servant,
with knowledge of the facts and appreciation of the danger,
may voluntarily accept the situation, and if he does so with-
out complaint or promise of change the risk is assumed to
the same extent as if it had originally entered into the con-
tract of employment.

3. ——— *Same.* If upon complaint to the master that the con-
ditions of the work are unsafe he refuses to better them, and
the servant, understanding the danger, continues to work, he
assumes the risk.

4. ——— *Same.* If under the circumstances just stated injury
befall the servant as a result of the defective conditions the
question of what a reasonably prudent man would have done
upon the master's declination to remedy them is immaterial.
If the servant in fact voluntarily chose to assume the risk of
appreciated danger the prudence of his conduct is not open
to investigation.

5. ——— *Independent Contractor.* It is not essential that one
who engages a contractor to produce a given result should
reserve, or should interfere and take, complete or exclusive
control over all features of the work to render him liable as
master of the contractor's servants; but the fact that he pos-
sesses a limited or partial control will not entail such a lia-
bility if the contractor is still left free to exercise his own
will generally respecting the methods and means of accom-
plishing the result.

6. —— *Same.* If an employer in fact assumes the relation of master to the servants of one whom he has engaged to produce a given result the duties and the responsibilities which the law imposes upon such a relation attach.

Error from Sedgwick district court; THOMAS C. WILSON, judge. Opinion filed June 8, 1907. Reversed.

*John˅ A. Eaton,* and *Holmes & Yankey,* for plaintiff in error.

*Stanley & Stanley,* and *Houston & Brooks,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The plaintiff, alleging himself to be an employee of the defendant, recovered damages for personal injuries sustained through the carelessness of a coemployee whom it was charged the defendant had been negligent in selecting.

The plaintiff had been in railroad service ever since he was eighteen years old, beginning as baggage master about the year 1875. After four or five years he became a freight conductor, and then became a passenger conductor. At the time of his injury he was the conductor of a construction train operated by a construction company engaged in building the defendant's railroad. In the absence of one of his brakemen the plaintiff was also acting in the capacity of brakeman. On April 25, 1903, while working in the yards at Carmen, Okla., he directed a flying switch to be made to change the engine from the south end to the north end of a string of cars. He was riding the disconnected cars toward the south, intending to stop them just beyond a switch. The engineer followed them down at a rapid rate of speed, struck them before the switch was reached, coupled to them, and then stopped with such violence that the plaintiff was thrown from his position on the top of a car to the ground, where he struck on his head. When the flying switch was executed there was a water-car, called a "pioneer car,"

and a box car in front of the engine. The brakeman who threw the switch rode on the ladder of the box car as the engine proceeded toward the south, and in violation of his duty neglected to give the proper signal in time to prevent a collision. When it was too late he gave a signal which caused the engineer to stop with a shock, after the coupling had been made. The defendant's answer contained the following allegation:

"That at the time the plaintiff received said injuries of which he complains in said amended petition, and immediately prior thereto, he, said plaintiff, was guilty of contributory negligence whereby the said alleged injuries were caused and occasioned, and at said time the said plaintiff so placed himself upon the train and car, and so moved thereon, and remained in such position, when he knew, or by the exercise of ordinary care might have known, that upon the coupling of said cars the same would be jarred and suddenly moved, and while in said position, and so negligent, as aforesaid, and in disregard of all precautions on his part for his own safety, the said plaintiff received the injuries aforesaid by reason of his negligence aforesaid, and at said time and place, while plaintiff was so engaged as brakeman upon said train and cars, he well knew, or by the exercise of ordinary care might have known, of each and all of the dangers and hazards incident to his employment as brakeman, the risk and. hazard thereof being by said plaintiff at the time of his said injuries, and prior thereto, assumed."

It is clear that contributory negligence and assumption of risk are both pleaded. The plaintiff concedes that the defense of contributory negligence is interposed, but disputes that the other is made. If a separate paragraph had been made beginning with the words "at said time and place, while plaintiff was so engaged," there could be no doubt about the matter. As it is, the meaning is perfectly plain; and in the absence of a motion to make it more specific the answer sufficiently charged assumption of risk. Besides this, in instruction No. 11, not excepted to, the court told the jury the plaintiff assumed the ordinary risks

of the negligent acts of his coemployees, and in instruction No. 15, not excepted to by the plaintiff, the court told the jury it was for them to determine from the evidence whether the plaintiff assumed the risk resulting in his alleged injuries. Therefore there can be no dispute that assumed risk was a litigated issue.

On the trial much evidence was introduced relating to the manner in which the brakeman, whose name was Mills, was in the habit of performing his duties, and much evidence relating to the plaintiff's knowledge of his conduct. From the evidence the jury made the following special findings of fact:

"Ques. Was brakeman Mills in the habit of carelessly and negligently performing his duty as brakeman in and about the switching and coupling of cars, during the month of April, 1903? Ans. Yes."

"Q. Was brakeman Mills grossly negligent in and about the discharge of his duties as brakeman in and about the shifting and coupling of the cars at the time and place in question, on the day plaintiff claims to have been injured? A. Yes.

"Q. If you answer 'yes' to the last above question, then did such negligence of brakeman Mills materially and proximately contribute to causing any of the injuries to plaintiff complained of by plaintiff? A. Yes."

"Q. Did not the plaintiff as conductor, Mills as brakeman, and Ballou as engineer, become members of the same crew in running the construction train before the plaintiff was injured? A. Yes.

"Q. Were not the plaintiff, Mills and Ballou members of the same crew from about the first of April, 1903, till the accident? A. Yes."

"Q. Was not the movement of the train and switching of the cars during which Loosley was injured under his direction and control? A. Yes.

"Q. Did not the plaintiff participate in and assist in the movement of the cars and doing the switching in the manner in which it was done just prior to the accident? A. Yes."

"Q. Had not the switching of cars by the construction crew, of which plaintiff was conductor, been done in a similar way on previous days before plaintiff was injured? A. Yes."

"Q. Had not the plaintiff for about twenty-five days prior to the accident been in charge, as conductor, of the train crew wherein engineer Ballou and brakeman Mills were working?  A.  Yes.

"Q. During that time was it not his duty to observe the character of the work of engineer Ballou and brakeman Mills?  A.  Yes."

"Q. Had not engineer Ballou and brakeman Mills been daily under conductor Loosley, the plaintiff, several days in April, 1903, immediately prior to the accident?  A.  Yes."

"Q. Did not the plaintiff know at the time of the accident the character of the work that the engineer, Ballou, and the brakeman, Mills, had been doing?  A. Yes.

"Q. Had not the plaintiff an opportunity to know and see the work of brakeman Mills for several days in April, 1903, prior to the accident in which plaintiff was injured?  A.  Yes.

"Q. Was not the work of brakeman Mills for several days prior to accident under the control of the plaintiff as conductor of the train?  A.  Yes."

"Q. For how long a time before plaintiff was injured were the plaintiff, Mills and Ballou members of the same crew?  A.  Twenty or twenty-five days."

"Q. Did the plaintiff ever make objection to the defendant, the Kansas City, Mexico & Orient Railway Company, prior to the accident, to the character of the work of engineer Ballou and brakeman Mills, or either of them?  A.  No."

Upon a state of the evidence productive of these findings the defendant requested the following instruction:

"The court instructs the jury that if the plaintiff knew, or by the exercise of ordinary care might have known, that either the engineer, Ballou, or the brakeman, Mills, or either of them, were incompetent or habitually negligent, and after such knowledge, or after, by the exercise of ordinary care, he might have had such knowledge, he continued his work as conductor upon the construction train, or if he acted as brakeman in the place of one of the other brakemen temporarily absent, without having made objection as to such incompetency or habitual negligence of such engineer and brakeman, or either of them, he will then

be deemed to have assumed the risk of such incompetency or negligence of such engineer and brakeman, or either of them, and he therefore cannot recover for any injury resulting from such incompetency or habitual negligence."

The request was refused; but, recognizing the necessity of not ignoring altogether the defense of assumed risk, the court inserted the two disconnected references to it discovered in the following prolix instruction:

"In determining as to whether or not the plaintiff may recover against the defendant, the Kansas City, Mexico & Orient Railway Company, you are instructed that it is for the jury alone to determine from the evidence in the case as to what injuries, if any, plaintiff received as claimed by him, and the extent of such injuries, if any, and as to what negligence, if any, the defendant railway, its servants, agents and employees, were guilty of, as charged by plaintiff, and as to whether plaintiff was or was not guilty of any negligence in the premises, or as to whether plaintiff assumed the risk resulting in any of the alleged injuries, and as to whether or not the said brakeman Mills and engineer Ballou, who are charged by plaintiff with the negligent acts which plaintiff claims resulted in his injury, were subject to the control of the defendant company at the time and place in question, and said train was being operated by said railway company; and if you determine that the plaintiff and said brakeman Mills and engineer Ballou were then and there subject to the control of the defendant railway company, and were guilty of the negligent acts charged at the time and place in question, it is for you then to further determine as to whether said brakeman Mills was, on said 25th day of April, 1903, and for some time prior thereto, an unfit, incompetent and unsafe person to be placed and retained in the position of brakeman, and if so, then as to whether the defendant railway company knew, or by the exercise of ordinary care on its part should have known of such unfitness and incompetency in time to have acted on such information and avoided the injury, if any, to plaintiff; and it is for you to determine as to whether plaintiff knew or should have known of such unfitness

Railway Co. v. Loosley.

and incompetency of said Mills, if you find that he was unfit and incompetent, or was guilty of contributory negligence contributing to the injury complained of, if any he received, and you are to determine as to whether the alleged negligence of said Mills, if he was negligent as charged, materially and directly contributed to plaintiff's injury, if any he received; and you are instructed that all of these questions and all the issues and facts are to be determined by you from the evidence in the case; and if you determine all of the issues in favor of the plaintiff and against the said railway company, being guided by all the instructions herein, then your verdict should be against the railway company and in favor of the plaintiff in this action; otherwise it should be in favor of said railway company."

The defendant claims the court erred in refusing its request. The plaintiff argues that the instruction tendered was faulty and hence was properly refused. For present purposes it may be conceded that this is true. It may further be conceded that without a request the court was not obliged to instruct upon the matter involved. But if a defective request actually brings to the court's notice an important principle of law which ought to be stated to enable the jury to render an intelligent verdict, it may be prejudicial error to disregard it; and if an attempt be made by an instruction to submit the subject defectively covered by the request to the consideration of the jury, it should be sufficiently explicit and comprehensive to cover fairly the field of the request. Manifestly the instruction given is no equivalent for the instruction asked. Indeed, so far does it come from containing an explication of assumed risk that, in its effect upon a jury unlearned in the law, it would more likely bewilder than enlighten. The question was one of the most important the case presented. It was vigorously contested. It is one the least understood by laymen. The effect upon the plaintiff's right to recover of his voluntarily working without protest day after day for a

long period of time with a man who was habitually negligent in the very matter which resulted in the casualty, whose work it was the plaintiff's duty to observe and direct, and the character of which he knew, was clearly brought to the mind of the court. It was in fact dealt with, but inadequately and inconclusively, and in view of the character of the special findings returned the result was prejudicial to the defendant. Therefore, even upon the hypothesis that the requested instruction is inaccurate, the court erred.

The instruction requested, however, fairly states the law as it has long been established in this state. With the addition, justified by the decision in the case of *U. P. Rly. Co. v. Monden*, 50 Kan. 539, 31 Pac. 1002, that if an employee in the exercise of reasonable care ought to have known of the dangers of the service he will be held to the consequences of actual knowledge, the instruction is in full accord with the doctrine stated in the case of *K. P. Rly. Co. v. Peavey*, 34 Kan. 472, 8 Pac. 780. In that case the plaintiff was a yardman. An engineer of a switching-engine was in the habit of carelessly sending cars back too hard. On an occasion he did this and the yardman was injured in an attempt to make a coupling. Discussing the facts the court said:

"Peavey knew Ellis's competency, capacity and habits; and he well knew them, for he himself had ample capacity and opportunity to judge. They had been coemployees together in the same yard for a long time. Also, Peavey himself had great experience as a railroad man." (Page 480.)

As applicable to these facts the court announced the following rule of law:

"If an employee knows that another employee is incompetent, or habitually negligent, or that the materials with which he works are defective, and he continues his work without objection, and without being induced by his employer to believe that a change will be made, he will be deemed to have assumed the risk of such incompetency, negligence, or defects, and can-

not recover for an injury resulting therefrom." (Page 479.)

It is the duty of the master to make the conditions of a servant's work reasonably safe. One of the conditions is that the servant be furnished with reasonably careful coservants. But if the master does not perform this duty the servant, with knowledge of the facts and appreciation of the danger, may voluntarily accept the situation, and if he does so without complaint or promise of change the risk is assumed to the same extent as if it had originally entered into the contract of employment.

Here the plaintiff was an old railroad man whose duty during the greater part of his life had been to oversee the work of brakemen. For twenty-five days he had observed, as it was his duty to observe, the conduct of this brakeman in reference to switching and coupling cars, and knew that the disregard of those precautions for the safety of others which an ordinary man would take was the characteristic form of his behavior. There is some evidence which might or might not be taken as a complaint to the superintendent of the construction company, but no evidence that any change was promised or hoped for. There is evidence that on the occasion of the conversation with the superintendent of the construction company the superintendent said that he believed the brakeman to be competent, but there was ample evidence to warrant the jury in finding, as they did, that the plaintiff knew him to be incompetent. Therefore, before this injury occurred the conditions under which the plaintiff knew he would be obliged to work were established, with a brakeman who was habitually negligent forming a part of the master's equipment. This being true, the principle to be applied is identical with that announced in the case of *A. T. & S. F. Rld. Co. v. Schroeder,* 47 Kan. 315, 27 Pac. 965, in which it was charged the

master did not provide sufficient help. The syllabus reads as follows:

"While it is the duty of an employer, whether a railroad company or other corporation or person, to make the work of his or its employees as safe as is reasonably practicable, yet when the employee, with full knowledge of all the dangers incident to or connected with the employment as it is conducted, accepts the employment, or, having accepted the same, continues in it with such full knowledge, and without any promise on the part of the employer, or any reason to expect on the part of the employee, that the employment will be made less dangerous, the employee assumes all the risks and hazards of the employment."

In *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 Kan. 129, 12 Pac. 582, the second paragraph of the syllabus states the law as follows:

"But where a railway is so constructed and a competent railroad man is employed to work in one of the company's yards as yard switchman, and in such yard there are many switches and about twenty guard-rails, and the employee voluntarily and without complaint does switching in such yard every day for about two and one-half months, when he steps between the main rail and the guard-rail of one of the company's railway tracks, and because thereof receives injury, *held*, that the condition of the railway tracks and the danger must have been known to the employee, and therefore that he assumed the risk."

In the case of *S. K. Rly. Co. v. Drake*, 53 Kan. 1, 35 Pac. 825, the opinion reads.

"He rests his case wholly upon the failure of the company to furnish sufficient help. He was an experienced man, of full age, capable of judging what number of employees was necessary to safely do the work, and if there was an insufficient number he knew that as well as the company knew it. The work was simple, and the risks and dangers were obvious. Possessed of a knowledge of the men employed, the manner in which the work was to be done, and the hazards which it involved, he voluntarily accepted employment, and continued in the service of the company, and must be deemed to have assumed the risks incident to such

service.   We only follow in the path of authority in holding that an employee, by voluntarily remaining in the service, with full knowledge of the dangers of the service, assumes the risks of such dangers, and absolves the employer from liability for damages in case of injury."   (Page 7.)

The cases cited above and the following cases contain the principal and most illustrative decisions of this court upon the subject under consideration: *McQueen v. C. B. U. P. Rld. Co.,* 30 Kan. 689, 1 Pac. 139; *St. L., Ft. S. & W. Rld. Co. v. Irwin,* 37 Kan. 701, 711, 16 Pac. 146, 1 Am. St. Rep. 266; *Clark v. Mo. Pac. Rly. Co.,* 48 Kan. 654, 29 Pac. 1138; *S. K. Rly. Co. v. Moore,* 49 Kan. 616, 31 Pac. 138; *U. P. Rly. Co. v. Monden,* 50 Kan. 539, 540, 31 Pac. 1002; *S. K. Rly. Co. v. Drake,* 53 Kan. 1, 35 Pac. 825; *Morbach v. Mining Co.,* 53 Kan. 731, 37 Pac. 122; *A. T. & S. F. Rld. Co. v. Lannigan,* 56 Kan. 109, 42 Pac. 343; *Railway Co. v. Puckett,* 62 Kan. 770, 64 Pac. 631; *Lanyon v. Bell,* 64 Kan. 739, 68 Pac. 609; *Emporia v. Kowalski,* 66 Kan. 64, 71 Pac. 232; *Railway Co. v. Bancord,* 66 Kan. 81, 71 Pac. 253; *Walker v. Scott,* 67 Kan. 814, 64 Pac. 615; *Railway Co. v. Sledge,* 68 Kan. 321, 74 Pac. 1111; *Hoffmeier v. Railway Co.,* 68 Kan. 831, 75 Pac. 1117; *Schwarzschild v. Drysdale,* 69 Kan. 119, 76 Pac. 411; *Brinkmeier v. Railway Co.,* 69 Kan. 738, 77 Pac. 586; *Creamery Co. v. Daniels,* 72 Kan. 418, 83 Pac. 986; *Railroad Co. v. Burgess,* 72 Kan. 454, 83 Pac. 991.

These decisions outline the law of assumed risk about as follows: When a servant is given employment he has the right to take it for granted that the duty of the master to make the conditions of the employment reasonably safe has been performed.   He assumes no risk arising from the master's negligence in this respect, and need not institute an investigation for dangers resultant upon the master's lack of ordinary care.   The master, however, has the right to order his work after his own plan and to conduct it after his own methods.   If this involve hazards beyond

8—76 KAN.

those ordinarily incident to employment of the kind presented, the servant should be informed of them. Starting upon this footing the servant assumes the risks. If at any time afterward the servant be confronted with danger consequent upon the master's negligence, the question may arise whether a reasonably prudent man would encounter it. The servant must then act with reasonable care; and if he does not he will be chargeable, not with assumption of risk, but with contributory negligence. In the progress of the work defects and imperfections may develop which in due course are ordinarily remedied as a result of inspection, and while waiting for this to be done the conduct of the servant is to be judged upon the principles of contributory negligence and not upon those of assumption of risk.

If the master fail to make the employment reasonably safe, and the danger takes on the aspect of a continuing condition which the servant knows about and understands or which is so patent that ordinary care would bring it to his attention and appreciation, he may accept the situation and continue to work without complaint. If he does so he assumes the risk. On the other hand, he may apply to the master for a betterment of the condition. If what the servant regards as a danger be one respecting which the master has superior knowledge he may rest upon the master's assurance of safety, if any be given. Under some circumstances, too, the master's statements or representations may induce the servant to relax his vigilance. But if nothing of this kind occur, or if master and servant are on an equal footing in opportunity for knowledge of the facts and in ability to interpret them, and the servant knows or ought to know and duly appreciates or ought to appreciate the danger, and continues to work, he assumes the risk.

If the master promises to repair, to discharge, or otherwise render safe, the danger may still be so glaring that a reasonably prudent man would not expose

himself to it until a change had been made. If so, and
the servant continues to work, he is guilty, not of as-
sumption of risk, but of contributory negligence. If
the hazard is not so great but that with reasonable
prudence the work may still be carried on the servant
may, exercising due care, work a reasonable time
awaiting repairs or other promised removal of danger
without either assuming the risk or being negligent.
If after the lapse of such time the promised better-
ment is not installed and the negligent condition again
takes on the character of permanency, the servant as-
sumes the risk.

If upon complaint to him the master makes no
promise to repair, or refuses to change the negligent
condition, the servant is in the same attitude as if he
were originally applying for work in a business or-
ganized and conducted upon a negligent basis, the
dangers of which he knows and appreciates. If he
goes on he assumes the risk. In case of injury the
question is not what a reasonably prudent man would
have done or ought to have done; it is simply what the
servant with his eyes open in fact chose to do. Rea-
sonable prudence is not involved. Under the circum-
stances stated the servant must decide whether or not
he will assume the risk, and if he does so the reasona-
bleness of his conduct in point of care for his safety
is not open to investigation.

In Missouri, and perhaps in some other jurisdic-
tions, an attempt has been made to engraft the rules
of contributory negligence upon assumption of risk
after the master's neglect or refusal, upon complaint,
to remedy conditions negligently suffered to exist, and
the authorities to that effect are invoked here. Such a
rule is arbitrary with the court adopting it, and for
the reasons stated is unsound. The subject has been
disposed of by this court in the following language by
Mr. Chief Justice Horton:

" 'Usually, where some instrument or appliance has
become unsafe, from use or otherwise, and the danger

from its use is not imminent or obvious, the servant may continue in the master's employment and use, if for a short time, with the expectation that the master will restore the defective instrument or appliance to its former condition.' (*Rush v. Mo. Pac. Rly. Co.*, 36 Kan. 129, 12 Pac. 582.)   But if a servant continues in his work an unreasonable length of time after the master has agreed to remedy the defect complained of, or if the danger is imminent or obvious, he assumes the risks incident thereto.   Generally, the question of reasonable time is one of fact for a jury; but where a servant has full knowledge of the danger of his employment, as in this case, after his first injury, and continues in the master's service while he is conducting his business in a way which the servant knows is dangerous, the servant cannot continue to wait, and, after being injured, then claim damages.   He should leave his dangerous employment within a reasonable time, on discovery of the master's method of doing business, when he finds that the master will not remedy the danger or fulfil his promise in that respect." (*Morbach v. Mining Co.*, 53 Kan. 731, 740, 37 Pac. 122.)

The case of *Northern Pacific Railroad Co. v. Mares*, 123 U. S. 710, 8 Sup. Ct. 321, 31 L. Ed. 296, holding that mere notice of incompetency will not make continued service for a short time with an incompetent coemployee contributory negligence is cited as opposed to the law of assumed risk stated above, but it is not so.   The defense in that case was contributory negligence, and not assumed risk, and the decision makes no reference to assumption of risk.

From the foregoing it is clear that the judgment of the district court must be reversed, and it becomes necessary to consider some other questions likely to be of moment on a second trial.   The petition counted specifically upon the relation of master and servant between the plaintiff and defendant, and the negligence charged was want of care in the selection of the servant at the time he was employed.   The answer denied that the plaintiff was a servant of the defendant and charged that he was a servant of the Kaw Valley Construction Company, an independent contractor, which

was engaged in constructing the defendant's road. It also contained the following allegation:

"This defendant had no voice or authority in the employment of any of the agents or servants of the said Kaw Valley Construction Company, nor did it employ any of the same, nor did it have the right, power or authority to discharge, remove or direct any such employees, nor did it employ or have any authority or direction over any of the other employees of said Kaw Valley Construction Company, engaged in the operation and moving of the train mentioned and stated in plaintiff's amended petition."

The train crew of which plaintiff was a member was hired by the construction company. The work of construction progressed toward the south. The road had been turned over to the defendant to Carmen, and the defendant had installed an operating department with jurisdiction to that point. South of Carmen the construction company was in full control. The construction company's material yards at Carmen were north of the station, and its trains in the Carmen yards were subject to the time-card, rules and regulations of the defendant and used tracks belonging to the defendant. What the defendant's rules and regulations were does not appear. The testimony concerning the relations between the construction company and the railway company was furnished chiefly by the superintendent of the defendant. He said he was responsible to his company for administering its affairs in the yards at Carmen and north of Carmen; that he had absolute control over all trains there; that he would not surrender the control over the operation of construction trains on tracks within his jurisdiction; that men on the construction trains would be subject to his orders and were subject to his company's rules and regulations. But the extent of his supervision, direction and control he made definite by the following testimony:

"Ques. In Carmen what were the rights of your company with respect to the rights of the construction company? Ans. Well, there was not any special rights

given to either the construction company or the railroad. The construction company's material yard was located in Carmen and consequently they had to come to Carmen.

"Q. How did they operate, and how did you operate in Carmen? A. Well, each company came into the yards when they had to do their work, looking out for the other so that no trouble would occur; no special rights given to either company in the yards."

"Q. You stated that the fellows operating the train were under your supervision while they were on the road? A. Yes, sir.

"Q. I want to ask you whether these men that were operating this construction train at the time Mr. Loosley was hurt were under your supervision? A. Whether I had jurisdiction?

"Q. No; not jurisdiction—supervision and direction? A. I, as to their own work? Not as to the work they should perform, or how they should perform it.

"Q. Did you have anything to do with that? A. Nothing."

"Q. Mr. Foley, you have already stated that the Kaw Valley [Construction Company] was engaged in the building of the road? A. Yes, sir.

"Q. And after the first day of April the railroad company commenced operating the line from Milton to Carmen? A. Yes, sir.

"Q. Now, after it commenced to operate to Carmen did the construction continue to go on? A. Yes, sir.

"Q. Where? A. South of Carmen.

"Q. Was there some construction, such as surfacing and ballasting, going on, and putting in additional ties, north of Carmen? A. Yes, sir; some unfinished track north of Carmen.

"Q. Who was looking after or doing the work of finishing that track? A. The Kaw Valley Construction Company.

"Q. Was that work going on during the month of April, 1903, both north and south of Carmen, in the manner in which you have stated? A. Yes, sir."

"Q. What right or authority did you have over the road south of Carmen during the month of April, 1903? A. None.

"Q. What right or authority to employ or discharge the men of the construction company that were engaged in its work, either in handling its construction

trains on the work or construction, did you have during the month of April, 1903?   A. I had none.

"Q.   Had the yards or work in the yards been completed?   A. Yes, sir.

"Q.   At Carmen—been completed during the month of April, 1903?   A. I do not remember about that. Some tracks in there, but I cannot say whether all were finished or not.

"Q.   If there was any work incomplete in the yards, whose duty was it?   A. The Kaw Valley Construction Company."

"Q.   Did you have any control or direction with reference to how that work should be done?   A. No, sir; none whatever.

"Q. When a material train was brought from the south, or front, into Carmen for the purpose of switching and moving cars to secure one of these construction trains, did you have control, authority or direction as to the manner in which they should handle their train?   A. No, sir."

"Q.   What material or appliance of any kind or supplies did the construction company have at Carmen during the month of April, 1903?   A. Had rails, ties, bridge timbers, bolts, spikes, and all material necessary to build a railroad.

"Q.   Where did they have that with reference to the yards in Carmen?   A. On the old main track, and afterward built a material track from the old main track to increase their yard.

"Q.   Did you have any jurisdiction or control over the employment of that material, or its being handled or taken and hauled to the front on the construction train, or the employees engaged in such work?   A. I had no authority over the handling; had nothing to do with the handling of the material, or the men in the work."

"Q.   What were the facts as to the operation of the construction train from the south into Carmen by the construction company during the month of April, 1903? A.   The construction train would enter the yard, if they had been out on the road.   Their first duty would be to examine the register and see whether the regular trains had arrived, and then they would go ahead and do whatever work that was necessary, and get any orders or information in regard to the trains overdue. They would get that from my office.   But in regard

to their work in the yard, or going into the yard, there would be no orders necessary."

The contract for the construction of the road which was introduced in evidence made the construction company an independent contractor, with full dominion over the work of construction and with no responsibility to others respecting its conduct or management or in any other respect except for the character of the result. There was no evidence of any actual interference on the part of the defendant with the management, direction or control of the construction train upon which plaintiff was injured, or with reference to the particular work or steps of the work in which it was then engaged. There was evidence that the train and its crew were doing purely construction-company business at the time plaintiff was injured. There was no evidence that the work being performed was of any interest or concern to the defendant. The cars which were being moved were to be placed upon a side-track. Near the switch was a coal-car used for the purpose of coaling the defendant's engines. It was the plaintiff's intention to take this car out, attach it to the cars he was switching, and then set them on the side-track so that the coal-car would occupy the same position respecting the switch and main track it did before. What benefit it was to the defendant to take this coal-car out and put it back the plaintiff does not pretend to suggest.

Upon this state of the evidence the plaintiff abandoned the theory of an actual hiring and requested the court to instruct upon the theory of supervening control on the part of the railway company over the construction company's servants, which was done. The defendant insists that the instructions departed from, and were at variance with, the petition, but in view of the allegations of the answer quoted above it may fairly be said that the question of responsibility consequent upon efficient control was within the issues.

The authoritative instruction upon the subject was

No. 15, quoted above. From this instruction the jury might very well have drawn the inference that if the brakeman, Mills, and the engineer, Ballou, were at the time of the casualty subject to the control of the defendant to any extent or for any purpose the defendant would be liable. The words "authority," "direction," "supervision," "superintendence," "control" and others of like character may indicate much or little, and this court is unable to say what the trial court intended.

It is not essential that one who engages a contractor to produce a given result should reserve, or should interfere and take, complete or exclusive control over all features of the work to render him liable as a master of the contractor's servants, but the fact that he possesses some control will not necessarily entail such liability. No matter if the control go to the extent of conditioning the work in many aspects, still if the contractor is left free to exercise his own will generally respecting methods and means he is independent and the employer is not the master of his servants. This distinction between a limited, special or partial control residing with the employer and a general control over methods and means vested in the contractor has been recognized in the following among other pertinent cases: *Scarborough v. Ala. Midland Railway Company*, 94 Ala. 497, 10 South. 316; *Callahan v. Burlington and Missouri River R. R. Co.*, 23 Iowa, 562; *Miller v. The Minnesota & N. W. Ry. Co.*, 76 Iowa, 655, 39 N. W. 188, 14 Am. St. Rep. 258; *Eaton v. European and North American Railway Company*, 59 Me. 520, 8 Am. Rep. 430; *Cuff, Adm'x, v. Newark and New York R. R. Co. et al*, 35 N. J. Law, 17, 10 Am. Rep. 205; *Hughes v. Railway Co.*, 39 Ohio St. 461; *Rogers v. Railroad Company*, 31 S. C. 378, 9 S. E. 1059; *Powell v. Construction Company*, 88 Tenn. 692, 13 S. W. 691, 17 Am. St. Rep. 925; *Frassi v. McDonald*, 122 Cal. 400, 55 Pac. 139; *Norwalk Gaslight Co. v. Borough of Norwalk*, 63 Conn. 495, 28 Atl. 32; *Foster v. City of Chicago*, 197 Ill. 264, 64 N.

E. 322; *Humpton v. Unterkircher & Sons,* 97 Iowa, 509, 66 N. W. 776; *Harding v. Boston,* 163 Mass. 14, 39 N. E. 411; *Kimball v. Cushman,* 103 Mass. 194, 4 Am. Rep. 528; *Wood v. Cobb & another,* 95 Mass. 58; *Rait v. New England Furniture & Carpet Co.,* 66 Minn. 76, 68 N. W. 729; *Kelly v. The Mayor &c. of New York,* 11 N. Y. 432; *Uppington v. City of New York,* 165 N. Y. 222, 59 N. E. 91, 53 L. R. A. 550; *City of Erie v. Caulkins,* 85 Pa. St. 247, 27 Am. Rep. 642. (See, also, *Kas. Cent. Rly. Co. v. Fitzsimmons,* 18 Kan. 34; *St. L., Ft. S. & W. Rld. Co. v. Willis, Adm'x,* 38 Kan. 330, 340, 16 Pac. 457; *C. R. I. & P. Rly. Co. v. Groves,* 56 Kan. 601, 44 Pac. 628; 65 L. R. A. 445, 475, note.)

It may be conceded that the superintendent of the railway company made statements which if taken literally might indicate that he had complete dominion over every movement of the construction company's trains and every detail of its work at Carmen, and the plaintiff had the right to go to the jury upon them. But a fair inference from his testimony as a whole is that the construction company's trains were under his jurisdiction and subject to the time-card, rules and regulations of the railway company merely to the extent necessary to prevent conflict and confusion from the joint use by the two companies of the same tracks and yards; that the railway company was not doing the work of the construction company in any sense; that it was not, *pro tanto,* building its own road; that all the details in the prosecution of that work were left to the full discretion of the construction company; that the superintendent could not say when a train should take out material, or when it should return to the material yards, or prohibit it from going or returning, or say how it should be handled, or who should handle it, and so generally respecting the manner and means of carrying out the construction company's contract; and the defendant had the right to go to the jury upon this theory. If the jury had taken this view they

Railway Co. v. Loosley.

might have found that the railway company had "control" over the plaintiff's train. in the sense that it was on track turned over under the contract, that it was subject to the railway company's time-card, rules and regulations, and that it was under the jurisdiction of the railway company's superintendent, and yet they rightfully might have returned a verdict for the defendant.   The instructions should have protected the defendant in this respect, so that it could not be made to respond when it was not in fact a superior.

Of course if an injury should result proximately from any exercise or abuse of the limited power retained by an employer, he would be liable; and if in fact his control was general over methods and means, and not limited or partial in the sense pointed out, he would be liable whether he exercised it or not.   If an employer in fact assumes the relation of master to the servants of one whom he has engaged to produce a given result the duties and responsibilities which the law imposes upon such a relation attach.

The imposition of all accrued costs upon the defendant as a condition of permission to amend its answer during the trial seems too severe under the circumstances, and the order to that effect is set aside.

The evidence upon another trial may be such that a discussion of other assignments of error would serve no useful purpose.

The judgment of the district court is reversed and the cause is remanded for a new trial.