Argued April 8, decided April 15, 1913.

## MONTGOMERY v. SOUTHERN PACIFIC CO.*

(131 Pac. 507.)

Courts—Controlling Decisions—Decisions of Federal Courts on Federal Questions.

1. The decisions of Federal courts construing and applying the Federal Employer's Liability Act (Act April 22, 1908, c. 149,

---

*As to State regulation of relations between railroad companies engaged in interstate commerce and their employees, see notes in 15 L. R. A. (N. S.) 134, and 29 L. R. A. (N. S.) 240.

Generally, as to validity of a statute abrogating the fellow servant rule, see note in 12 L. R. A. (N. S.) 1040. .                REPORTER.

35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) will be followed by the State courts.

**Commerce—Interstate Commerce—Regulation—Statutes—Construction.**

2. A member of a switching crew, engaged in moving oil from an oil car to provide fuel for engines used in interstate commerce, is within the protection of the Federal Employer's Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]).

**Commerce—Interstate Commerce—Statutes—Construction.**

3. The members of a switching crew engaged in switching and spotting cars to be loaded and loaded with interstate commodities, and in hauling cars up the mountains to a station from which they may conveniently be taken by a regular interstate train passing over an interstate railroad, are within the protection of the Federal Employer's Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]).

**Commerce—"Engaged in Interstate Commerce"—Statutes—Construction.**

4. All employees who participate in the maintenance or operation of the instrumentalities for the general use of an interstate railroad, thereby enhancing the utility of interstate commerce, are engaged in interstate commerce within the Federal Employer's Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]).

**Commerce—Interstate Commerce—Statutes—Construction.**

5. In an action under the Federal Employer's Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]), for injuries to a member of a switching crew engaged in moving oil from an oil car to provide fuel for engines used in interstate commerce, evidence of the general duties of the employee and the other members of the crew during the time the employee had been employed by the railroad company was material to show the employee's general duties and the kind of business in which the car of oil was to be used.

From Multnomah:  ROBERT G. MORROW, Judge.

Statement by MR. JUSTICE BEAN.

This is an action by Samuel M. Montgomery against the Southern Pacific Company, a corporation, and is

brought under the act of Congress of April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1911, p. 1322), generally known as the Employer's Liability Act. The principal question involved in this case is whether or not plaintiff was engaged in interstate commerce, at the time he was injured, so as to bring him within the terms of that act. At the time of the accident complained of, plaintiff was employed by the defendant as a brakeman in one of its switching crews, engaged in making up trains between Weed, California, and Pioneer, in the same State. The defendant company was engaged in interstate commerce, operating a main line of railroad between Portland, Oregon, and San Francisco, California, and also a branch line extending from the main line at the station of Weed, and running up into Oregon to Klamath Falls. Its principal business was in carrying freight and passengers from State to State. The duties of the switching crew were to assist in making up trains, setting cars in and out, and keeping the road clear and ready for traffic. Their section of road extended from Weed south to Pioneer, a distance of about 14 miles. This part of the road was situated in a lumber region. There were many large mills and factories at the different places, from which large shipments of lumber, box material, etc., were made to all parts of the United States, and also to local California points. Empty cars would be left at these switches by regular trains, and it was the duty of the switching crew to set them in for loading, and, when loaded, to pick them up and set them out upon a sidetrack next to the main line in such a position that they could be conveniently taken up by the regular trains. It was also the duty of the switching crew to collect these cars at different stations and carry them over the mountains to Sisson, from which place they could be more easily transported by the regular trains; the grade going south being too steep for heavily

loaded trains to attach the cars at Weed and other points
north. The evidence tended to show that the shipments
from Weed were largely interstate shipments, and that
all this interstate traffic was necessarily moved every
day by the switching crew; that the interstate freight,
and also the intrastate freight, was carried at times in
foreign cars which came from roads in the east and mid-
dle west, and sometimes in cars belonging to the defend-
ant company.

On the morning of the 16th of May, 1909, plaintiff
started out with the switching crew for the purpose of
moving any interstate commerce, and also of handling
any local business, that there might be along the road.
During the day they switched and moved cars, destined
to points outside of the State, around the yard that they
might be taken up by the regular trains in the usual
course of business. On this day they went down as far
as Sisson. Defendant claims that all cars handled by
this train on this day were from and destined to points
within the State of California. Plaintiff testified on this
point as follows:

"Q. What are the facts as to whether during that
time you were or were not handling cars for points out
of the State of California, both loaded and unloaded, and
to what extent?

"A. We were handling cars going out of the State of
California, quite a number of them, day after day—
every day."

On the way back from Sisson, before putting up their
engine for the night, they undertook to move an oil car
at the station of Weed. This car had come from the
oil fields of California, and was being moved, primarily,
for the purpose of providing fuel for the engine which
was to run up into Oregon on the interstate road on its
regular trip, and also for the purpose of providing their
own switch engine with oil in order that they might
continue on the morrow in the handling of articles of

interstate, as well as state, commerce.   From this car they pumped oil into the tank of the engine.   While engaged in moving the oil car in the regular course of business, by some miscalculation it was left standing on the point of the frog at the intersection of the wye of the main line running into Oregon.   In order to clear the track for the incoming passenger from Oregon on this branch line, and to get the car to the point where it was to be left for the purpose of supplying oil, it was necessary to move the car from the frog.   It was thought necessary to move the car by chaining it to the engine and by moving the latter forward on one branch of the wye, thereby throwing the car farther along the other track, which was nearly parallel at this point, until it passed the frog so that the engine could get by.   While at this wye, plaintiff was standing near the car attending the chain, when the engineer suddenly and violently started up his engine in such a way that it threw the chain suddenly around and caught plaintiff's hand.   Then the engineer continued to start and stop violently several times, causing the plaintiff's hand to be entirely torn off.

Upon the trial of the cause it appeared that plaintiff had been at work in the employ of the defendant from May 9 to May 16, 1909.   Counsel for plaintiff inquired of the witnesses in regard to the setting of cars loaded by one of the lumber companies at that place, during the above-mentioned time, that were to be shipped beyond the California line.   Objection was made by counsel for defendant for the reason that the evidence was confined to the day and time of the accident.   The court sustained the objection, whereupon plaintiff offered to prove the following facts:

"That the business in which the plaintiff was engaged was generally that of handling both interstate and state traffic; that they would start out in the morning to find what work was to be done, with the intention and instructions to switch whatever cars were ready to be switched,

whether interstate or state, and to ascertain whether there were any interstate cars to be switched, and to switch them if there were; that the oil car which they were engaged in moving at the particular time contained oil which was being removed to another point in the yard of the company for the purpose of getting it off the track and out of the way of traffic on the main line up to Klamath Falls, and also for the purpose of placing it where the oil in the car could be distributed and used; that the oil in the car was some of it to be distributed to engines of the defendant running out of the State of California and into the State of Oregon, and other portions of it were to be used by the plaintiff and the train crew, of which he was a member, and was placed up there that night, partly that they might get oil for their engine on the morrow for the purpose of going out on their regular trip to switch and distribute interstate and state commerce alike, and to be used by them on other succeeding days in the same way; and there was no other crew doing that kind of switching or any switching at Weed and other stations within that district during the time that plaintiff was so employed; and that their crew did all the switching, both state and interstate."

The trial court sustained the defendant's objection to this offer of proof, and ruled that before the plaintiff would be engaged in interstate commerce, within the meaning of the act of Congress, he must have been engaged at the time in handling a car which either came from out of the State or was bound outside of the State, or was passing through the State. There was testimony tending to show the negligence of the engineer and the resulting injury.          REVERSED AND REMANDED.

For appellant there was a brief over the names of *Messrs. Bennett & Sinnott* and *Mr. C. B. Watson,* with an oral argument by *Mr. Alfred S. Bennett.*

For respondent there was a brief over the names of *Mr. William D. Fenton, Mr. Ben C. Dey, Mr. Kenneth L. Fenton* and *Mr. Ralph E. Moody,* with oral arguments by *Mr. Moody* and *Mr. Dey.*

MR. JUSTICE BEAN delivered the opinion of the court.

It is contended by counsel for plaintiff that the work plaintiff Montgomery was doing at the time of the injury complained of was incidental to the movement of interstate commerce, and that he was acting partly as an agent of interstate commerce at the time, and was therefore "engaged in interstate commerce" within the meaning of the act. Counsel for defendant contend: (1) That neither the engine, caboose, nor tank car was an instrument of interstate commerce; (2) that, while moving this tank car, defendant was not engaged in interstate commerce, nor was plaintiff employed therein. The "Employer's Liability Act" provides:

"That every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

The first and main question is, Did the work in which the plaintiff and his associates were engaged at the time of the injury have a real or substantial connection with interstate commerce, so as to bring plaintiff within the protection of the act? The question is not an entirely new one.

1. The Federal courts have blazed the way to be followed in determining most, if not all, of the questions involved in this action.

2. As will be noticed, the evidence tended to show that the plaintiff was engaged in moving the oil for the purpose of providing fuel for the engines used in transmitting freight and passengers from California into Ore-

gon.  The oil was to be used principally for the engine and crew with which plaintiff was engaged in his general work of switching interstate cars and spotting, setting out, and moving them from station to station.  It appears that about two-thirds of the work of plaintiff, of switch crew, and engine was the moving of cars used in the transportation of interstate commodities, although all of plaintiff's work was done in the State of California.

Mr. Thornton, in his work on the Federal Employer's Liability and Safety Appliances Acts (2 ed.), § 38, says:

"It is beyond debate that the statute embraces all engineers, firemen, brakemen and conductors employed at the time of their injuries upon an interstate train.  In one case it is said that the statute covers a telegraph operator dispatching trains, and in that same case it is said that Congress meant to include everybody whom it could include. * * It includes a car repairer in a switching yard repairing interstate cars. * * No doubt, it is believed, but what a freight handler of interstate freight in loading and unloading cars in which it is to be or has been carried is covered by the terms of the statute. So are mechanics or repairmen, while engaged upon interstate cars, engines or other interstate instrumentalities, and even while passing over the railroad for the purpose of repairing such cars, engines or instrumentalities. Likewise the members of an emergency crew while at work upon any interstate train or any railroad track that is a highway of interstate commerce.  Linemen fall within its terms.  Not only are track repairers within its terms but also those who construct or repair the signal wires used by an interstate railroad, even though they be used without discrimination between the local or interstate character of its traffic. * * In the case of yardmen engaged in making up an interstate train, under the liberal construction given these Federal statutes by the courts, there is no doubt but what they will be held within the terms of this Employer's Liability Act."

In the case of *Mondou* v. *N. Y., N. H. & Hartford R. R. Co.*, and the other cases decided therewith, 223 U. S. 1, at page 48 of the opinion (32 Sup. Ct. 169, at

page 174: 56 L. Ed. 327: 38 L. R. A. [N. S.] 44), Mr. Justice VAN DEVANTER said:

"Congress, of course, can do anything which in the exercise by itself of a fair discretion, may be deemed appropriate to save the act of interstate commerce from prevention or interruption, or to make that act more secure, more reliable, or more efficient. The act of interstate commerce is done by the labor of men and with the help of things; and these men and things are the agents and instruments of the commerce. If the agents or instruments are destroyed while they are doing the act, commerce is stopped; if the agents or instruments are interrupted, commerce is interrupted. * * "

The part of the opinion on page 52 of 223 U. S. (32 Sup. Ct. 176: 56 L. Ed. 327: 38 L. R. A. [N. S.] 44), is peculiarly applicable to the case at bar. It is there said:

"It is true that the liability which the act creates * * is imposed for the benefit of all employees of such carriers by railroad who are employed in interstate commerce, although some are not subjected to the peculiar hazards incident to the operation of trains. * * "

Digressing from the main question, this language, to our minds, indicates that the ruling of the circuit court sought and obtained by the learned counsel for defendant, to the effect that, before plaintiff would be engaged in interstate commerce within the meaning of the act of Congress, he must be engaged at the time in handling a car which either came from out of the State, or was bound outside of the State, or was passing through the State, restricts the matter within too narrow limits.

In Doherty, Liability of Railroads to Interstate Employees, § 17, pp. 88, 89, it is said:

"But what rule may be laid down for the determination of the question, 'When is an employee engaged in interstate commerce?' The crew of an interstate train is of course included. A switchman engaged in duty, as such, for an interstate train, a freight handler while

employed in handling interstate or foreign freight, and mechanics or car repairmen while engaged in work upon interstate cars or other interstate instrumentalities, and while passing over the road for the purpose of making repairs upon cars or engines of an interstate train, are also included, and emergency or wrecking crews, while at work upon any train on an interstate highway, may reasonably be included. In other words, all who are at the time of injury engaged in duty which has direct relation to the interstate business of the carrier are entitled to the protection of the act."

And on page 229, Doherty, Liability of Railroads to Interstate Employees, it is said:

"All who participate in the maintenance of the instrumentalities for the general use of the road, even in the maintenance of such instrumentalities as are used on purely local branches, necessarily participate in the work of interstate commerce, because interstate commerce is carried on over every part, branch, section, and division of the entire system of such interstate road."

In *Southern Ry. Co.* v. *United States,* 222 U. S. 20, 27 (32 Sup. Ct. 2, 4: 56 L. Ed. 72), we find the following:

"Cars are seldom set apart for exclusive used in moving either class of traffic, but generally are used interchangeably in moving both; and the situation is much the same with trainmen, switchmen, and like employees, for they usually, if not necessarily, have to do with both classes of traffic. Besides, the several trains on the same railroad are not independent in point of movement and safety, but are interdependent, for whatever brings delay or disaster to one, or results in disabling one of its operatives, is calculated to impede the progress and imperil the safety of other trains."

In *Louisville & Nashville R. R. Co.* v. *Melton,* 218 U. S. 36, 48 (30 Sup. Ct. 676: 54 L. Ed. 921), the court said:

"A railroad cannot be run without bridges; bridges cannot be built without carpenters. The work of a bridge

carpenter on a railroad is perhaps no less perilous than the work of an operative on one of its trains. Coal tipples are no less essential to the operation of a railroad than bridges, because the engines cannot be operated without coal. The construction of a coal tipple is therefore essential to the operating of a railroad."

In the case of *Zikos* v. *O. R. & N. Co.* (C. C.), 179 Fed. 893, the plaintiff was engaged in repairing a track used incidentally in both classes of traffic. It was held that his employment came within the law; the court saying at page 898:

"But where the employment necessarily and directly contributes to the more extended use and without which interstate traffic could not be carried on at all, no reason appears for denying the power over the one, although it may indirectly contribute to the other."

See, also, *Colasurdo* v. *Central R. R. Co.* (C. C.), 180 Fed. 832, which is a strong case and very much in point.

As stated in the brief of the late Solicitor General, and quoted in the Mondou case, 223 U. S. 48 (32 Sup. Ct. 174: 56 L. Ed. 327: 38 L. R. A. [N. S.] 44), "Interstate commerce (if not always, at any rate when the commerce is transportation) is an act." Let us then determine whether or not the act in which plaintiff was engaged at the time of the injury was one relating in a substantial way to interstate commerce.

3. A large part of the general duties of plaintiff, with his associates, was in switching and spotting cars to be loaded, and cars loaded, with interstate commerce commodities. In order to aid and accelerate such interstate business, the plaintiff, with the other members of the crew, by means of the engine, hauled cars up the mountains to a station from which they could conveniently be taken by a regular, through, or interstate train passing over an interstate railroad. Loading freight and making preparation for the same to be shipped by switch-

ing the cars and attaching them to the regular train, and especially in transporting the cars a portion of the distance, would seem to be as much a part of the interstate traffic of a railroad as the actual transportation across the State line; so, also, would be the furnishing and pumping of oil for the engines to be used in such interstate business. Was not the act which plaintiff was performing at the time of the accident just as essential to interstate commerce as the repairing or the pulling of the throttle of an engine used in such traffic? It was a necessary act in the transmission of interstate freight, and all who co-operated in the work were engaged in interstate commerce within the meaning of the act of Congress. It was closely connected with his general duties. Oil is the food that gives life and strength to the engine, furnishing the motive power for the transportation of interstate freight, and by the aid of which a stream of commerce flows from State to State and from State to foreign nations. To illustrate, draw a line to represent the boundary between two States; draw another line, crossing the first, to represent the stream of interstate commerce. Whatever act in a substantial manner aids, accelerates, or increases the amount of, or furnishes a part of the supply for, such stream, and is connected therewith, to the same extent may be said to aid, support, and maintain the act of interstate commerce. Such labor makes interstate commerce more secure, more reliable and more effective. Suppose that all the agents engaged in providing oil to be used as fuel in interstate commerce upon a railroad, as this oil was destined to be used, should cease to act, for instance, on account of a boycott or by reason of an injunction order issued by a State court for some purpose conceived to be good (a violent assumption), and there were a failure of the supply of fuel and both the switch and interstate engines were compelled to stop, the stream of

interstate commerce would also stop or be lessened to the same extent.  What court or lawyer would say that under these circumstances there was not a substantial interference with interstate commerce?

4.  In the business of an interstate railroad, the interstate and intrastate traffic is intermingled and usually handled indiscriminately.  It would be practically impossible to name any servant of an interstate road who is employed exclusively in the furtherance of purely interstate traffic.  All employees who participate in the maintenance or operation of the instrumentalities for the general use of the road, thereby enhancing the utility of such commerce, are necessarily engaged in the work of interstate commerce, within the meaning of the act. The fact that a portion of plaintiff's work pertained to local traffic would not change the character of his labor in the performance of acts reasonably proximate and essential to the moving of interstate freight, and in assistance thereof.   Doherty, § 58; Thornton, § 37.

The evidence introduced and offered upon the trial in the case at bar tended to show that the defendant railroad company, and the plaintiff, its employee, were, at the time of the injury complained of, engaged in interstate commerce by railroad, within the meaning of the act of Congress.  It follows, if this be true, that plaintiff was entitled to the protection of the act, and the case should have been submitted to the jury.  This conclusion is, we think, in harmony with the act of Congress, the above authorities, and *Darr* v. *B. & O. R. Co.* (D. C.), 197 Fed. 665; *Lamphere* v. *O. R. & N. Co.*, 196 Fed. 336 (116 C. C. A. 156) ; *Horton* v. *O.-W. R. & N. Co.*, 130 Pac. 897) ; *Jones* v. *Chesapeake & Ohio Ry. Co.*, 149 Ky. 566 (149 S. W. 951) ; *Breske* v. *M. & St. L. Ry. Co.*, 115 Minn. 386 (132 N. W. 337).

5.  The evidence tendered by plaintiff, relating to the general duties of the plaintiff and of the other members

Sig. 20

of the switching crew during the time plaintiff had been employed by the railroad company, was, in our opinion, material for the purpose of showing plaintiff's general duties and the kind of business in which the car of oil was to be used. The trial court erred in rejecting the evidence. The position of counsel for defendant is that it is immaterial what plaintiff's general duties were, or what he may have been engaged in at any other time than that of the accident, and they cite therefor, among other authorities, Doherty, § 17, pp. 87, 88, and Thornton (2 ed.), § 37. But we do not so read these authorities. They are to the effect that it is not enough to show that an employee was engaged generally by an interstate railroad company in order to come within the provisions of the act, but that he must go further and show that he received his injury while engaged in interstate commerce for the company. This does not necessarily indicate that testimony as to his general duties would be immaterial.

The judgment of the lower court will therefore be reversed, and the cause remanded for such further proceedings as may be proper, not inconsistent with this opinion.                    REVERSED AND REMANDED.