No. 19,217.

## J. W. BARKER, *Appellee*, v. THE KANSAS CITY, MEXICO & ORIENT RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. RAILROADS—*Employee Engaged in Intrastate Traffic When Injured—Action Not Within Purview of Federal Employer's Liability Act.* An interstate railroad when engaged in hauling cars of coal over its line from a point in one state to another point in the same state where their bulk is to be broken and some portions thereof afterwards used for fuel on engines running into other states, is not by virtue thereof engaged in interstate traffic.

2. SAME. Upon the facts stated in the opinion it is held that the plaintiff, who was a fireman on a switch engine, was at the time he sustained his injuries engaged in hauling coal which at a later date might become a part of an instrumentality used in the transportation of interstate commerce, but that his work had no real and substantial connection with interstate commerce.

3. SPECIAL FINDINGS—*Control General Verdict.* In this case it is held that the general verdict in favor of the plaintiff is controlled by the special findings which establish that the plaintiff at the time he sustained his injuries was not engaged in interstate commerce.

4. SAME—*Erroneous Instruction as to Assumption of Risk.* In an action by the servant to recover for personal injuries where assumption of risk is one of the defenses, it is error to charge the jury that even if they found that plaintiff had assumed the risk, that would not constitute a defense unless they further found that the dangers were so glaring that an ordinarily prudent person would not have encountered them.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed February 6, 1915. Reversed.

*Chester I. Long, A. M. Cowan,* both of Wichita, *S. W. Moore, John A. Eaton, D. W. Eaton,* and *H. J. Eaton,* all of Kansas City, Mo., for the appellant.

*S. B. Amidon,* and *Jean Madalene,* both of Wichita, for the appellee.

Barker v. Railway Co.

The opinion of the court was delivered by

PORTER, J.:   This is an appeal by the railway company from a judgment in plaintiff's favor for injuries sustained while in its employ.

When the case was here before, *Barker v. Railway Co.*, 88 Kan. 767, 129 Pac. 1151, a judgment in plaintiff's favor was reversed on account of error in the admission of evidence, and because the instructions assumed some of the facts in issue. The action was brought under the federal employers' liability act (35 U. S. Stat. at L., p. 65), and one of the questions is whether at the time he received his injuries the plaintiff was engaged in interstate commerce work.

The plaintiff was the fireman of a switch engine. The crew was ordered to take the engine from Altus, Okla., where it was in use, to Clinton, Okla., to have some work done upon it. The day following, on the return trip from Clinton to Altus, the derailment occurred which caused the plaintiff's injuries, and at this time the train consisted, besides the engine, of one water car and nine cars loaded with coal. The defendant concedes that it was engaged generally in the business of transporting interstate commerce on its line of railway between Altus, Okla., and Wichita, Kan., but denies that in hauling the coal or train in question it was transporting interstate commerce. Stated in another way, the contention is that the work plaintiff was doing at the time of the injury had no real and substantial connection with interstate commerce.

On the second trial the jury found that the destination of the switch engine and train at the time the injury occurred was Altus, Okla.; that the destination of the water car was Dill City, Okla.; that the train started from Clinton, Okla.; that the origin of the nine cars of coal was McCurtain, Okla., and their destination Altus, Okla., consigned to N. J. O'Brien, vice president of the Kansas City, Mexico & Orient

12—94 KAN.

Railway Company of Texas, for use on engines running south of Altus into Texas, and for engines running north into Oklahoma.

The plaintiff testified that they were taking the coal to Altus for use on engines running north into Oklahoma and south into Texas; that there was a coal yard at Altus kept by the company; that coal of this kind taken to Altus would be scooped out of the cars onto the tenders of the engines.

The decisions as to what will constitute interstate commerce in a case like this were quite fully reviewed in a former opinion (88 Kan. 767), and it will not be necessary to refer to them at length here. The findings in the present case are conclusive, and show that the movement of the coal from McCurtain to a consignee at Altus, Okla., was intrastate. Of course, cases where the intention of the shipper when the property was first started in transit was to forward it to a foreign destination have no application to the facts of the present case. The cars were consigned to Altus, Okla., and there the shipment ended. The most that can be said is that the plaintiff was handling coal which at a later date might become a part of an instrumentality used in the transportation of interstate commerce. But this fact alone could not make him an employee engaged in interstate commerce. The several cars of coal being transported at the time plaintiff received his injuries were to be unloaded at Altus, their bulk broken, and some portions thereof afterwards were to be used for fuel on engines running into other states. The situation would be no different if, instead of coal, the shipment had consisted of articles intended to be used in the repair of a locomotive running from Altus into Texas. In such a case the mere fact that the consignee intended to attach the articles to a locomotive engaged in interstate commerce would not make the shipment between Clinton, Okla., and Altus, Okla., interstate in character.

In *Pederson v. Del., Lack. v. West. R. R.*, 229 U. S. 146, it was held that:

"One engaged in the work of maintaining tracks, bridges, engines or cars in proper condition after they have become and during their use as instrumentalities of interstate commerce, is engaged in interstate commerce, and this even if those instrumentalities are used in both interstate and intrastate commerce." (Syl. ¶ 2.)

It was said, however, in the opinion:

"Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such." (p. 152.)

In *Heimbach v. Lehigh Valley R. Co.*, 197 Fed. 579, it was held:

"Employees of a railroad company, injured while repairing a car of another company which had reached the end of its run, been unloaded, and was lying at a station awaiting orders, were not at the time employed in interstate commerce within Employer's Liability Act April 22, 1908, c. 149, § 1, 35 Stat. 65 (U. S. Comp. St. Supp. 1911, p. 1322)." (Syl.)

As tending to support the same doctrine, see *Ill. Cent. R. R. v. Behrens*, 233 U. S. 473, 34 Sup. Ct. Rep. 646; *Pierson v. N. Y., S. & W. R. R. Co.*, 83 N. J. Law, 661, 85 Atl. 233; *L. & N. R. R. Co. v. Ohio Valley Tie Co.*, 148 Ky. 718, 147 S. W. 421; *Oregon R. & Navigation Co. v. Campbell*, 180 Fed. 253; *Jackson v. Chicago, M. & St. P. Ry. Co.*, 210 Fed. 495.

The finding of the jury that at the time of his injury plaintiff was engaged in interstate commerce is overturned by the special findings, which establish that he was not so engaged. Besides, the court erroneously charged the jury, in substance, that it would constitute interstate commerce in this case if the shipper, or the defendant, intended that the coal, when it reached its destination at Altus, should be loaded upon tenders of

locomotives for use on trips extending into Texas. For these reasons the judgment must be reversed.

The petition alleged a cause of action under the general law aside from the federal employers' liability act, but the defendant insists that the judgment should be reversed because certain findings of the jury are in conflict with the undisputed evidence, and further, that there was error in the instructions. Two of the special findings are as follows:

"Question 2. Did plaintiff know or could he by the exercise of ordinary care have known before leaving Clinton for Altus that the track at the place where the derailment occurred was rough and uneven? Ans. No.

"Question 3. Did plaintiff know before leaving Clinton for Altus on the day of the accident that it was dangerous and unsafe to run or operate said engine over the rough and uneven track at a rate of speed of eight to ten miles per hour? Ans. No."

The jury also found, in answer to question No. 6, that plaintiff, before leaving Clinton for Altus, did not know that the switch engine was not proper or safe to run over the track between those stations. The plaintiff testified as follows:

"I knew it was dangerous to operate a switch engine over a rough track at ten miles an hour, and I knew there were some very bad holes in the track, as I had been over it the day before. . . . I knew that the condition of this track was very rough and full of holes. I found this out from receiving orders and from riding over it. I got that information from just such an order as that to which my attention has been called here. . . . From the order I knew that there were bad holes in that piece of track. . . . The ground was frozen and there was snow on it. . . . The slow order covered a whole lot of bad track all the way from Clinton to Altus. . . . I knew all of these things about a switch engine before I took this engine. It isn't customary to run one of these switch engines over the road. As a matter of fact, it is considered dangerous because it has no pony trucks."

Barker v. Railway Co.

He further testified that on the day before the acci-dent, when they left Altus, the crew received a slow order.  Referring to the language of the order, he said:

"The part of the order that refers to the piece of track on which we were derailed is 'very rough places between Bridge 104 and Braithwaite.' That is the order we had when we left Altus the day before.  I read the order then."

In the face of these admissions of plaintiff it is diffi-. cult to understand how the jury made the special find-ings referred to, and especially the finding that the plaintiff did not know that the track at the place where the derailment occurred was rough and unsafe.  The plaintiff. testified that there was no "slow order" given for the return trip, and that in going back, on the re-turn trip, he did not know that the hole was in the track.  This is explained in the brief upon the theory that since there was no order given to run slow on the return trip, the plaintiff had a right to assume that defendant had repaired the track since the order of the day before.  Plaintiff testified that he knew the ground was frozen and covered with snow, and he must have known on the return trip that the track had not been repaired.  Besides, the clearance card directing the re-turn trip contained the following statement:

"This does not interfere with or countermand any orders you may have received."

Aside from these considerations, the court erred in instructing the jury with regard to assumption of risk. In several instructions the jury were told that the plain-tiff did not assume the risk incident to such a trip un-less such dangers "were so glaring that an ordinarily prudent man would not have attempted to make the trip"; that if it were not so glaring but that a prudent man would have encountered it, he could not be charged with assumption of risk.  These instructions do not cor--rectly state the law.  They are directly contrary to the

ruling in *Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990, where it was held that:

"If the servant in fact voluntarily chose to assume the risk of appreciated danger the prudence of his conduct is not open to investigation." (Syl. ¶ 4.)

One of the instructions in which this error appears quotes largely from that portion of the opinion in the Loosley case, where some of the distinctions between contributory negligence and assumption of risk were pointed out and commented upon. In view of the fact that courts frequently fail to distinguish between the two defenses, it is quite probable that an instruction drawn in this way would only lead to confusion in the minds of the jury. However, the vice in the instruction lies in the fact that the court failed to follow the rule declared in the Loosley case. The jury were charged that even if they found that plaintiff had assumed the risk, that would not constitute a defense unless they further found that the dangers were so glaring that an ordinarily prudent person would not have attempted to make the trip. The same statement is repeated three times in instruction No. 24.

In *Railway Co. v. Loosley,* supra, the rule applying to a situation where the servant knows and appreciates the dangers was stated, and it was said in the opinion:

"If he goes on he assumes the risk. In case of injury the question is not what a reasonably prudent man would have done or ought to have done; it is simply what the servant with his eyes open in fact chose to do. Reasonable prudence is not involved. Under the circumstances stated the servant must decide whether or not he will assume the risk, and if he does so the reasonableness of his conduct in point of care for his safety is not open to investigation." (p. 115.)

In the brief of the plaintiff an effort is made to find some support for the wording of the instructions by reference to certain language used in the opinion in the recent case of *Fleener v. Packing Co.,* 92 Kan. 573, 141

Barker v. Railway Co.

Pac. 246. It was there said, following a citation to *Every v. Rains,* 84 Kan. 560, 568, 115 Pac. 114:

"The jury were instructed, in substance, that unless the danger was so obvious that a man of ordinary prudence would not have attempted to use the plank, then he had a right to obey instructions and use it. This, with other instructions, fairly submitted the questions of assumed risk and contributory negligence." (p. 575.)

The other instructions given are not set forth in the opinion. It was certainly not intended by the language used to announce a rule of law so in conflict with previous decisions on the subject as that contended for by the plaintiff. Manifestly the writer of that opinion had in mind the situation and the rule of law involved in *Every v. Rains,* supra. In that case the following rule from 4 Thomp. Com. L. of Neg., § 4641, was approved:

"The servant does not accept the risks of unknown, latent, unseen or obscure defects or dangers, such as the servant would not discover by the exercise of ordinary care and prudence, having reference to his situation," etc.

In the case at bar the court, in substance, told the jury that even though the plaintiff knew and understood the danger, still, unless it was so glaring that no prudent person would have encountered it, there was no assumption of the risk.

The judgment will be reversed and the cause remanded for further proceedings in accordance herewith.