MATTHEW FOLEY

*vs.*

WALKER D. HINES, Director General of Railroads.

Cumberland.    Opinion December 8, 1920.

*Action for personal injuries.    Provisions of the Federal Employers' Liability Act of
April 22, 1908, U. S. Comp. St., Vol. 8, Secs. 8657-8665, not applicable.
Defendant was engaged in Interstate Commerce, but plaintiff at the time of
the injury in doing his particular work was not employed in such com-
merce.    Instrumentalities in order to come within the act, must be
impressed with an interstate character.    Assumption of risk
by plaintiff not a defense.    Plaintiff had the right to
recover as at common law, aided by the Workmen's
Compensation Act of Maine, R. S., Chap.
50.    Negligence of defendant the sole
question.    Verdict large
but not grossly
excessive.*

Action by employe of the Portland Terminal Company to recover damages for
injuries sustained while at work "trimming coal" in the hold of a vessel at the
company's wharf in Portland.    Plaintiff recovered a verdict of $9120.27.
On defendant's motion for new trial and exceptions to the refusal of the presid-
ing Justice to direct a verdict for the defendant, it is,

*Held:*

1.    That this action under the evidence does not fall within the provisions of the
Federal Liability Act of April 22, 1908, U. S. Comp. St., Vol. 8, Secs. 8657-
8665.

2.    Two facts must co-exist to bring a case within that statute, first the injury
must be sustained while the railroad carrier is engaged in interstate commerce;
and second, the employe at the very moment of the accident must be employed
in, and the particular service rendered must be a part of, such commerce.

3.    The plaintiff concedes that the defendant was engaged in interstate commerce,
but the evidence shows that the plaintiff in doing his particular work at that
time was not employed in such commerce.

4.    The test is whether the employe at the time of the injury was employed in
interstate transportation or in work so closely related to it or in an act so directly
and immediately connected with it as substantially to form a part or necessary
incident thereof.

5. Instrumentalities which have not as yet become impressed with an interstate character are not within the act even though at some future time they may be or are intended to be devoted to such use.

6. The coal upon which the plaintiff was at work had not become so impressed. It was being removed from the hold of a vessel, a portion to a general pile on or near the wharf and a portion to the cars of the Maine Central Railroad Company for transportation to various stations. No part of it had been appropriated or segregated for interstate use. It might later be used for that purpose or for intrastate locomotives or for both. The most that can be said is that the plaintiff was handling coal which at a later date might become part of an instrumentality used in interstate transportation. But that fact could not make him an employe engaged in interstate commerce.

7. The plaintiff therefore had the right to recover as at common law, aided by the Workmen's Compensation Act of Maine, R. S., Chap. 50, so that the sole question is that of defendant's negligence.

8. The jury found negligence on the part of the defendant and the court is of opinion that the verdict is not so manifestly wrong as to be set aside.

9. Nor are the damages so grossly excessive as to indicate prejudice or want of comprehension on the part of the jury. The plaintiff is a common laborer. Lack of education prevents his filling a clerical position and he must still rely for support upon his seriously diminished capacity as such common laborer. He lost a portion of his leg and must wear an artificial limb. The injury is permanent. The suffering was intense. Considering all the evidence we think the damages were large but not grossly excessive.

On exceptions and motion for new trial by defendant. This is an action on the case to recover damages for personal injuries sustained by plaintiff while in the employ of the defendant, as a laborer in assisting in discharging coal from a vessel, at a wharf in Portland owned by defendant. Several counts at common law, and one invoking the provisions of the State Workmen's Compensation Act, R. S., Chap. 50, were embraced in the writ. Defendant filed the general issue, and also a brief statement of special matter of defense, alleging that the case came within the provisions of the Federal Employers' Liability Act of April 22, 1908, and that defendant could avail itself of assumption of risk by plaintiff as a defense. At the conclusion of the evidence the defendant orally submitted a motion for a directed verdict for defendant upon the grounds that plaintiff had failed to show negligence on the part of defendant; and that defendant was engaged in interstate commerce, hence could invoke the rule of assumption of risk by plaintiff as a bar to the action, which motion was overruled by the presiding Justice, and defendant excepted.

A verdict of $9120.75 was returned for plaintiff, and defendant filed a general motion for a new trial.  Motion and exceptions overruled.

The case is fully stated in the opinion.

*Richard E. Harvey, and William H. Looney,* for plaintiff.

*Charles B. Carter, of White, Carter & Skelton,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, MORRILL, WILSON, JJ.

CORNISH, C. J.  On August 14, 1918, the plaintiff, an employe of the Portland Terminal Company, sustained injuries while at work "trimming coal" in the hold of a vessel at the company's wharf in the City of Portland.  The jury rendered a verdict in his favor in the sum of $9,120.75 and the case is before the Law Court on defendant's exception to the refusal of the presiding Justice to direct a verdict for the defendant and on a general motion to set aside the verdict.  The reasons assigned for asking for a directed verdict are two; first because the plaintiff has failed to show actionable negligence on the part of the defendant, and second because he came within the provisions of the Federal Employers' Liability Act and the defense could therefore avail itself of the plaintiff's assumption of risk, which it claimed had been fully proven.

The writ contains several counts at common law and also one invoking the provisions of the State Workmen's Compensation Act, R. S., Chap. 50.  The legal rights of the parties as modified by that act will be considered later.

1.  FEDERAL EMPLOYERS' LIABILITY ACT.

The first inquiry that naturally arises is whether this case falls within the provisions of the Federal Employers' Liability Act, of April 22, 1908, U. S., Comp. Statute, Vol. 8, Secs. 8657-8665.  If it does, then the plaintiff's assumption of risk, and contributory negligence in reduction of damages, are open to the defendant unless the injury was caused through the violation of some statute enacted to promote the safety of employes.  No such statutory violation being claimed here those defenses would be available.  *Seaboard Air Line* v. *Horton,* 233 U. S., 492; *Jacobs* v. *Southern Railway Co.,* 241 U. S., 229; *Chicago etc. R. R. Co.* v. *Ward,* U. S. Sup. Court, Advance Op., No. 11, Page 33, decided March 1, 1920.

The essential words of Section 8657 are these:  "Every common carrier by railroad while engaged in commerce between any of the

several States . . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce. . . . ." Two facts must co-exist in order to bring a case within this provision, first the injury must be sustained while the carrier is engaged in interstate commerce, and second the employe must at the very moment of the accident be employed in and the particular service rendered must be a part of such commerce. Mere employment by an interstate carrier is not sufficient to meet the second requirement, and on the other hand the employe need not be regularly and continuously engaged in interstate work. The same workman on different days or on different hours of the same day may be engaged in interstate and intrastate work and he may pass from one to the other frequently, so that at one period he may be within and at another he may be without the scope of the Act. *N. Y. Central R. R. v. Carr*, 238 U. S., 260.

The facts in the case that must furnish the answer to this first inquiry are uncontroverted.

The defendant is a company which owns and operates certain railroad property formerly owned by the Maine Central Railroad Company and Boston & Maine Railroad, situated in Portland, Westbrook, South Portland and that vicinity. It also owns wharf property on the shore front in Portland harbor with all the necessary fixtures and appliances for discharging coal from vessels or barges. On the day of the accident the company's employees, among whom was the plaintiff, were engaged in discharging a cargo that had come by the steamer Louise, from Baltimore, Maryland, the consignor being the Consolidation Coal Company, and the consignee the Maine Central Railroad Company. The steamer docked on Wednesday morning, August 14, and finished discharging on Friday morning, August 16. Foley was injured on Thursday, August 15. The Terminal Company had nothing to do with the coal after it was unloaded. Its connection ceased when the cargo was discharged. Part of the coal was dumped from the buckets carrying the coal from the hold of the steamer into railroad cars on the wharf and part upon a pile located on the wharf. The Maine Central Railroad Company, the consignee, took charge of the cars and distributed them where it wished. This cargo of about 2900 tons was distributed as follows: To Deering Junction, Maine, about 440 tons; Thompson's Point, Maine, about 945 tons; North Conway, N. H. about 86 tons; Ricker

Hotel Company, Rockland, Maine, about 43 tons; Ricker Hotel Company, Kineo, Maine, about 16 tons, while the balance, about 1398 tons, or nearly one-half of the entire cargo, was left in a pile on the wharf. The coal shipped to Deering Junction and North Conway would be stored there and ultimately be used by both interstate and intrastate locomotives; that shipped to Thompson's Point, for use in the locomotive and car repairs belonging to the Terminal Company, where both interstate and intrastate equipment was repaired; what use would be made of that shipped to the Ricker Hotel Company is not shown, but presumably by that company in connection with its hotels at Rockland and Kineo; while the large portion left in the pile on the wharf was ultimately to be used as fuel by both interstate and intrastate locomotives of the Maine Central Railroad, Boston & Maine Railroad and Portland Terminal Company, as they might have occasion to coal there.

The plaintiff was one of the crew in the hold of the steamer employed in discharging this coal at the time of the accident. Did these conditions bring him within the provisions of the act in question? We have no hesitation in answering that question in the negative.

It should be borne in mind that the fact that the plaintiff was engaged in discharging coal from a steamer which had brought it from Baltimore, Maryland, to Portland, Maine, and therefore was in that sense engaged in interstate commerce is entirely immaterial. That steamer was not owned by the defendant and formed no part of its system, and the Federal Act applies only to "a common carrier by railroad." The Pawnee, 205 Fed., 333. The transportation to be considered here therefore is not concerned with the past but with the future, not with the ending of a voyage but the beginning of a shipment. The plaintiff concedes in argument that the defendant at the time of the accident was a common carrier by railroad within the meaning of the Act and was engaged in interstate commerce.

The issue is therefore narrowed to this, was the plaintiff in doing his particular work at that time employed in such commerce? The test laid down by the Supreme Court of the United States on this point is that the employee at the time of the injury must be employed in interstate transportation or in work so closely related to it or in an act so directly and immediately connected with it as substantially to form a part or necessary incident thereof. *N. Y. Cen. R. R. Co.* v. *Carr*, 238 U. S., 260; *Shanks* v. *Delaware &c. R. R. Co.*, 239 U. S., 556.

There is little difficulty in deciding whether the statute applies in a case of direct employment, as for instance to a conductor, engineer, or brakeman while actually employed in running an interstate train. The difficulty arises when we are asked to determine cases where the act or the work is connected with one of the many instrumentalities without which interstate transportation could not be carried on. In deciding cases in this broad domain the courts are governed by the reasonable and firmly established principle, that in order for instrumentalities such as tracks, bridges, engines, or cars to be regarded as engaged in interstate commerce they must already have been devoted to such use and impressed with such interstate character. If so the fact that they are also used for intrastate traffic does not destroy their interstate character. They need not be exclusively used for interstate work but they must have been impressed with the interstate character. A vital distinction exists here, which must not be overlooked. Tracks, road bed, bridges, buildings, are instrumentalities in the nature of fixtures and once having been devoted to interstate commerce they remain so during their use as such although also used in connection with intrastate traffic. But if these instrumentalities have not as yet become impressed with an interstate character then the mere fact that at some future time they may be or are intended to be devoted to such use does not bring them within the Act. To illustrate the foregoing principles: The following cases have been held to be within the Act: An employe engaged in sealing up and labeling both interstate and intrastate cars, *St. Louis &c. R. R. Co.* v. *Seale,* 229 U. S., 158; Yard clerk making record of incoming and outgoing interstate and intrastate cars, *Pittsburg R. R. Co.* v. *Farmers Trust Co.,* 183 Ind., 293; Member of construction crew operating steam shovel in removing earth from interstate tracks, *Tralich* v. *Chicago &c. Ry. Co.,* 217 Fed., 677; Section-hand sweeping snow from tracks used for both interstate and intrastate tracks, *Hordick* v. *Wabash R. R.,* 181 Mo., App., 160; Repairing telegraph lines used in directing interstate trains, *Deal* v. *Coal &c. Ry. Co.,* 215 Fed., 2936; Repairing engine used in interstate commerce, *Law* v. *Illinois Cen. R. R.,* 208 Fed., 871; *So. Pac. Co.* v. *Pillsbury,* 170 Cal., 787; Section-foreman inspecting track used for both; *Louisville R. R. Co.* v. *Kemp.,* 140 Ga., 659; *So. Ry. Co.* v. *Puckett,* 16 Ga. App., 556; *Anest* v. *Columbia &c. R. R.,* 89 Wash., 613; Coaling engine preparing to make interstate trip; *Armbruster* v. *Chicago &c. Ry. Co.,* 166 Iowa, 176;

Mechanic working on turntable while turning interstate engine,
*Chesapeake &c. Ry. Co.* v. *Koenhoff*, 67 Ky., 358; Section-foreman
repairing switches in yard used for making up trains of both kinds,
*Willever* v. *Delaware &c. R. R. Co.*, 87 N. J. L., 350; Signalman
operating signals controlling both kinds; *Cincinnati &c. R. R.* v.
*Bonham*, 130 Tenn., 446; Employe carrying bolts to be used in
repairing a bridge, *Pedersen* v. *Delaware &c. R. R.*, 229 U. S., 146.
In the case last cited the court was careful to note the distinction
between impressed and non-impressed instrumentalities by adding:
"Of course, we are not concerned here with the construction of tracks,
bridges, engines or cars which have not yet become instrumentalities
in such commerce, but only with the work of maintaining them in
proper condition after they have become such instrumentalities and
during their use as such."    See also *Kinzell* v. *Chicago &c. R. R.*,
250 U. S., 130.

Of cases held not to be within the statute the following may be
cited:   Laborer working on track intended to be used by both inter-
state and intrastate trains if and when completed; *Chicago &c. R. R.*
v. *Steele*. 183 Ind., 446; Conductor operating train loading ties to be
taken to a point within the State and subsequently to be used in
construction, either within or without the State, *Alexander* v. *Great
Northern Ry. Co.*, 51 Mont., 572; Employe in the construction of a
tunnel intended to straighten a line but as yet unused, *Raymond* v.
*Chicago Ry. Co.*, 243 U. S., 43; Unloading barrels of paint to be used
in painting both interstate and intrastate cars, *Salmon* v. *Southern
Ry. Co.*, 133 Tenn., 230; Brakeman on a train carrying water to a
tank within the State from which both inter and intrastate engines
took their supply; *M. K. & T. Ry* v. *Fesmire*, (1912), Tex. Civ.,
App., 150 S. W., 201.

Applying these principles and noting the clearly settled distinction
it is obvious that the coal in question at the time of the plaintiff's
injury had not become an instrumentality of interstate commerce,
and therefore the plaintiff was not employed in that commerce.   He
was at work assisting in the removal of coal in bulk from the hold to
the cars of the consignee or to the general pile on the wharf.   No part
of it had been appropriated or segregated for interstate use.   It might
be used for that purpose or it might be used for intrastate locomotives
or for both.   At some time in the future some other employe if
engaged in coaling an interstate engine from some portion of the
stock would be within the Act, as in *Armbruster* v. *Chicago &c. Ry.*

*Co.*, 166 Iowa, 176, before cited, but that time had not arrived and the plaintiff's work was no more directly and immediately connected with and a substantial incident of interstate commerce than that of a workman loading a railroad car at the mines. The cases so hold.

The fireman of a switching-engine handling cars of coal between two intrastate points, their bulk to be broken at the point of destination and some portions afterwards used for fuel on interstate engines, was held not to be engaged in interstate commerce, in *Barker* v. *Kansas R. R.*, 94 Kan., 177. The court used this language: "The most that can be said is that the plaintiff was handling coal which at a later date might become a part of an instrumentality used in the transportation of interstate commerce. But this fact alone could not make him an employe engaged in interstate commerce."

Where an employe in a colliery was mining coal intended to be used in the company's locomotives moving interstate commerce, he was held not to be within the Act, in *Delaware &c. R. R. Co.* v. *Yurkonis*, 238 U. S., 439. So an employe engaged in removing coal from storage tracks to coal chutes destined at some time for use in interstate hauls, was held not to be an interstate employe, in *Chicago &c. R. R.* v. *Harrington*, 241 U. S., 177. In the course of the opinion the court said: "Manifestly there was no such close or direct relation to interstate transportation in the taking of the coal to the coal-chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use. It has been held that an employe of the carrier while he is moving coal in the carrier's colliery intended to be used by it in interstate locomotives is not engaged in interstate commerce within the meaning of the Federal Act, (*Del. &c. R. R.* v. *Yurkonis*, 238 U. S., 439) and there is no distinction in principle between the two cases."

The cases cited by the defendant are not in conflict with the rule which we apply. We will consider each of the defendant's cited cases.

In *Barker* v. *Kansas &c. R. R.*, 88 Kan., 767, 129 Pac., 1115, a new trial was granted because of error in the admission of evidence. The case was retried and reported again in 94 Kan., 177, 146 Pac., 358, where the court practically reversed its former view stated in the case cited by defendant, and held that the employe was not engaged in interstate commerce. This case has been cited already in this opinion among the illustrations of non-interstate employes.

In *Southern Ry. Co.* v. *Peters*, 194, Ala., 94, 69 So., 611, the plaintiff was working at a coal chute rolling a buggy of coal for an incoming interstate locomotive, a clear case of direct and immediate connection with interstate traffic.

In *Eng* v. *Steam Ry.*, 210 Fed., 92, plaintiff was injured while framing a new office in the defendant's freight shed which had been used for a long time in both interstate and intrastate business. *Held*: That this did not constitute construction of a new instrumentality of interstate commerce but the repair of an instrumentality already impressed with that use, and hence the plaintiff was within the Act, thus sharply marking the distinction we have already referred to.

In *Illinois Cen. R. R.* v. *Porter*, 207 Fed., 311, the plaintiff was injured while wheeling interstate freight from a warehouse into a car to be transported in interstate commerce, another obvious case of direct connection.

In *Central R. R.* v. *Colasurdo*, 192 Fed., 901, the plaintiff was repairing a switch in defendant's terminal yards over which both inter and intrastate commerce was continually transported.

In *Cousins* v. *Ill. Cen. R. R.*, 126 Minn., 174, 148 N. W. 59, the Supreme Court of Minnesota held that a workman wheeling coal to heat a railroad shop in which both interstate and intrastate cars, the most being interstate, were repaired was employed in interstate commerce, but that decision was reversed by the Supreme Court of the United States, on the authority of *Delaware &c. R. R.* v. *Yurkonis*, 238 U. S., 439, and *Shanks* v. *Delaware &c. R. R.*, 239 U. S., 556, both supra. See *Illinois Cen. R. R.* v. *Cousins*, 241 U. S., 641.

In *Montgomery* v. *So. Pacific Ry.*, 64 Or., 597, 131 Pac., 507, the plaintiff was a member of a switching crew engaged in moving an oil tank car to provide fuel for interstate engines, in switching and spotting cars loaded and to be loaded with interstate commerce and in hauling cars to a station from which they could be conveniently taken by a regular interstate train.

*Pelton* v. *Ill. Cen. Ry. Co.*, 153 N. W., 334 (Iowa), is simply a rescript per curiam, correcting on a rehearing a former opinion in the same case relating to pleading in this class of cases, and does not decide the point raised here.

In *Barlow* v. *Lehigh Valley*, 214 N. Y., 116, 107 N. E. 814, the New York Court held that the engineer of an engine switching coal-cars transported from another State so that they could be placed

on a trestle to be unloaded, and the coal to be taken indiscriminately by interstate and intrastate engines, was employed in interstate commerce. This was contrary to the well established rule and on error to the Supreme Court of the United States this decision was reversed. *Lehigh Valley R. R. Co.* v. *Barlow*, 244 U. S., 183.

Upon both reason and precedent therefore it is the opinion of the court that the plaintiff was not an interstate employe within the meaning of the Federal Statute at the time of his injury. The growing frequency of cases in this State in which this question arises affords the excuse for the prolonged discussion of the subject.

2. NEGLIGENCE OF DEFENDANT.

As the Federal Employers Liability Act is not involved, the plaintiff has a right of action at common law aided by R. S., Chap. 50, the Workman's Compensation Act so-called. The defendant is not an assenting employer and employs more than five workmen, so that it is deprived of the defenses of contributory negligence of a fellow servant and assumption of risk. This brings us to the consideration of the negligence of the defendant. The facts connected with the happening of the accident are as follows:

The plaintiff had been in the defendant's employ as a section-hand for several years, working more or less about the wharves, but had never taken part in discharging a vessel. After a month's vacation in the Summer of 1918 he applied to one McDonough, the foreman of the defendant's wharves and coal unloading facilities, for a job, and was told to report on August 4, for work "trimming coal," which he did, and he continued to work until August 15, the day of the accident. This was the mode of operation. These coal vessels have bulkheads running transversely, about thirty feet apart, from the deck to the bottom and sides, so that the hold is divided into several compartments with a hatch above each. The usual method of unloading is by means of an iron bucket weighing 3,000 pounds, with opening and closing jaws, which is operated from the wharf by means of an overhead crane or yard-arm. This bucket is extended by the yard-arm over the vessel, is dropped through the hatch way of a compartment, digs into the coal, fills itself, is hoisted up to the yard-arm, then on a trolley attached to the yard-arm is run ashore to a point above waiting railroad cars or above the wharf, then opened, spilling the coal into the cars for shipment or upon the wharf pile.

It is operated by two men located in a tower on the wharf, one an engineer who hoists, lowers, fills and empties the bucket, the other, the trolley-man, who runs the bucket on the trolley out to the proper position over the hatchway and back to the proper position over the cars or wharf. As a vessel lies at the wharf with the hatches open neither the engineer nor the trolley-man can see a man in the hold working on the inshore side. When the unloading begins the coal is nearly level with the deck and the bucket fills itself readily. Gradually it works its way down to the bottom in the center of the hold, with the coal on the four sides at an incline. As the yard-arm runs at right angles with the keel of the vessel it is possible for the engineer and trolley-man to throw the bucket toward the offshore side and the inshore side of the hold, but they cannot thrust it either forward or aft. When the coal has been cleaned by the bucket from the center and also from the offshore and inshore sides, men are sent down into the hold to shovel the coal from the corners and from forward and aft into the center so that the bucket may drop down and seize it. These men are called "trimmers," and it is this kind of work that the plaintiff was performing when injured. He had been working with a crew cleaning out a forward compartment, and when that was finished they were all sent aft to help another crew clean out hatch No. 2. Foley was the last man to leave the forward and to enter the rear compartment, and he took the only place that was left, which was in the wing on the inshore side. He was at work as he says trimming the coal, throwing it into the center, when the bucket came down the hatchway, swung in towards him and grabbed him by the leg. He had heard a shout from some of the crew, had straightned up and tried to step ahead, but the pile of coal in front of him prevented him from saving himself.

The jury found negligence on the part of the defendant, and it is the opinion of the court that their verdict on this point is not so manifestly wrong as to require intervention. The plaintiff was set at work by the foreman McDonough without any instructions or warnings whatever. This is admitted by the foreman, who also testifies that the other workmen had been instructed by his predecessor. And the plaintiff had not worked sufficiently long to gain the necessary knowledge by experience. After the trimmers were sent down into the hold the bucket was not supposed to be swung any more to either side, but to simply take the coal from the bottom directly under the

hatch, to which spot the trimmers were shovelling it. Had this course been followed the plaintiff would not have been injured. The foreman saw him at work on the inshore side and says he thought he was in a perfectly safe position. The bucket had come straight down once and taken the coal from the center in the regular way after the trimmers began work. The second time it was lowered it was made to swing inshore evidently by the men in control. There was no occasion to do this. It was out of the ordinary, and that was the precise act which caused the injury. The jury could well find that it was a negligent act on the part of the operators on the wharf.

3. EXCESSIVE DAMAGES.

The verdict was $9,120.75. The plaintiff is 41 years old. The injury consisted of two broken bones of the ankle, the astragalus and the cuboid, with an apparent crushing just below the ankle. Effort was made to avoid amputation, but gangrene set in and on September 3rd, the leg was amputated above the ankle. The plaintiff now wears an artificial limb and his physician testifies that he is and always will be incapable of hard physical labor. Yet he knows no other kind. Lack of education prevents his filling a clerical position and he must still rely for support upon his seriously diminished capacity as a common laborer. His wages at the time of the accident were fifty-six cents per hour with seventy-five cents for overtime. His physical suffering was at times intense. Upon this question of damages the defendant offered no testimony. From the very nature of the case the injury spoke for itself.

After studying the evidence and the situation carefully, and considering all the elements which enter into it, it is the opinion of the court that the damages although large are not grossly excessive. *Nadeau* v. *Caribou W. L. & P. Co.*, 118 Maine, 325, 329.

*Motion and exceptions overruled.*