### COLUMBIA & P. S. R. CO. v. SAUTER.

(Circuit Court of Appeals, Ninth Circuit. May 26, 1915.)

No. 2489.

1. COMMERCE ☞27—EMPLOYERS' LIABILITY ACT—"EMPLOYED IN INTERSTATE COMMERCE."

A railroad employé, who was killed while constructing a temporary bridge over which the railroad intended to move interstate trains, was "employed in interstate commerce" within Employers' Liability Act U. S. April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, §§ 8657–8665), since

that work was not independent of the interstate commerce in which the carrier was engaged.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

**2.** MASTER AND SERVANT ☞204—EMPLOYERS', LIABILITY ACT—DEFENSES—ASSUMPTION OF RISK.

Under Employers' Liability Act U. S. § 3, providing that the employer's contributory negligence shall not bar recovery, but shall only diminish the damages, with a proviso that no employé shall be held contributorily negligent where the carrier's violation of any statute enacted for the safety of employés contributed to his injury, and section 4, providing that an employé shall not be held to have assumed the risks of his employment, where the violation by the carrier of any statute enacted for the safety of employés contributed to his injury, assumption of risk is a defense to an action for injuries under that statute, where the negligence of the carrier, other than its violation of a safety statute, contributed to the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 544–546; Dec. Dig. ☞204.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Action by Otto E. Sauter against the Columbia & Puget Sound Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded for new trial.

The Columbia & Puget Sound Railroad Company is a local corporation of the state of Washington, and was, at the time of the happening of the accident about which inquiry is made, operating a steam railroad within the state, and engaged in interstate commerce. The company maintained a truss bridge across Cedar river, in King county, Wash., which rested on concrete piers, one upon each side of the stream. A few days prior to November 26, 1911, one of these piers was undermined by a freshet, so that it toppled over, but was left standing at a slant, and the bridge truss at that end settled with it, so that one side of the truss was still resting upon the pier; the other being unsupported. The truss at the other end, across the stream, was still resting upon the undamaged pier. By the settling of the truss, the rails carrying the ties were left suspended above it. The Milwaukee Railroad was at the same time operating a railroad paralleling the road of the Columbia & Puget Sound at this point, and maintained a bridge across Cedar river in proximity to the bridge of the latter company. The freshet also so injured the bridge of the Milwaukee Railroad as to render it unfit for use. In order, therefore, to get quick construction of a temporary bridge across the stream for the use of both roads for the time being, the Milwaukee joined forces with the Columbia & Puget Sound, and both were engaged at the time of the accident in driving piling and constructing false works over the old bridge of the Columbia & Puget Sound road; the false work being designed also for use in reconstructing such bridge. The freshet had carried logs and débris down against, and some of it into, the framework of the truss.

Walter Gilbert Thomson, the decedent, was at the time of the accident, and immediately preceding, engaged with other workmen in sawing the logs into lengths suitable for removing, and in making a cable fast to such as it was designed to remove. While he was doing the latter service, the bridge fell from its support upon him, causing his death. The method of removing the

logs was by a cable, operated by an engine stationed on the same side of the river on which the decedent was at work and running across the stream and over a pulley, thence back again to where decedent was engaged. The logs or timbers were attached to the cable and drawn into the stream, and, the cable being there disengaged, they were allowed to be carried away.

Now, in view of the situation, the plaintiff alleges that at the time of the accident there were present the bridge superintendent of the defendant and its roadmaster supervising the work; "that there was also engaged in said work a foreman directing the work of the men who were engaged in doing the work in connection with said bridge, which foreman was obeying the immediate orders and instructions of said superintendent of bridge work and said roadmaster, and the said Thomson was working under the immediate direction of the said foreman; that the said Thomson and several other men in the employ of the defendant, acting under the immediate directions of said foreman, were engaged in removing certain logs and timber which were jammed against the said bridge, and the said Thomson was engaged in doing the exact work which he was directed by said foreman to do; that at the time the said Thomson was thus working as aforesaid * * * the work of repairing and reconstructing said bridge was done by a careless, negligent, and improper method, in that the broken and sunken framework of said bridge above described was partially supported and sustained and resting upon the logs and timber above described, which were jammed against said bridge, and the defendant and its roadmaster, and the superintendent of bridges, and the foreman, carelessly and negligently failed to make any provision by props or supports of any kind for the holding up and sustaining of said broken frame of said bridge when said logs and timber should be removed; that by reason of the lack of such props and supports as above described, upon the removal of said logs and timber, the said framework of said truss bridge collapsed and fell down in a heap of wreckage, and as said bridge fell the said Thomson was struck in the head by a portion of the framework of said bridge," whereby he was killed.

The trial resulted in a verdict for plaintiff, and the cause is here on writ of error.

Farrell, Kane & Stratton and Stanley J. Padden, all of Seattle, Wash., for plaintiff in error.

Edward Judd and O. E. Sauter, both of Seattle, Wash., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). It is first urged in behalf of the railroad company that there is to be found in the record no sufficient evidence to support plaintiff's allegations that the defendant negligently and carelessly failed to make provision by props or supports of any kind for holding up and sustaining the broken frame of the bridge when the logs and timber should be removed. It was a material factor in plaintiff's case that this allegation should be established by competent proof. Without noticing the evidence particularly, it is sufficient, as this case must be reversed upon another ground, to say that we have examined the testimony and are persuaded that the allegation appears to be amply supported by evidence sufficient to carry the case to the jury.

[1] The next contention is that, in prosecuting the work of erecting the temporary structure for use by both railroad companies in passing their engines and trains over Cedar river, the defendant was not engaged in interstate commerce, and hence that the action could not

be maintained upon the theory on which it was instituted, it having been instituted under the federal Employers' Liability Act. It was admitted, beyond peradventure, at the trial, that the defendant company was engaged in interstate commerce, aside from the particular work in hand, by the following colloquy between counsel:

"Mr. Judd: If the court please, it was agreed by counsel, so that I need not subpoena here the principal officers of the railroad, that this railroad during the times mentioned in this complaint was engaged in transporting freight in interstate commerce.

"Mr. Padden: That is admitted, if your honor please.

"Mr. Judd: That it was a common carrier of freight, of interstate commerce freight; that the railroad as engaged in that business ran over this bridge.

"Mr. Padden: We do not admit anything further than the railroad was engaged in interstate commerce.

"Mr. Judd: Over this bridge and over this right of way. If not, I have been misled by counsel, and I will have to subpoena and call their head officers.

"Mr. Farrell: What is it you want us to admit?

"Mr. Judd: I want you to admit that you were taking this interstate commerce along the right of way which crosses this bridge.

"Mr. Farrell: We will admit that."

"Both roads," as counsel for defendant say, "had joined in the construction of this trestle for the purpose of expediting the traffic. The Milwaukee Company was building the trestle from one bank, and the Columbia Company from the other, with the intention of meeting at the center. The deceased was engaged in making clear a space in which piles could be driven, not to support the old bridge, but to support the new trestle."

While it is denied that the defendant company was at the time engaged in any way in constructing the new bridge, it clearly appears from the testimony that it had the new bridge in view at the time, and that the trestle was to serve, not only for a temporary structure for passing engines and trains over in interstate traffic, but also as false works for rebuilding the old bridge.

P. C. Brown, superintendent of bridges and buildings for the defendant company, testified:

"Q. You were building a new bridge in the same place? A. Well, later on. At that time it was just to get the traffic over. Q. Just for what purpose were you removing the logs and rubbish and stuff that had accumulated around the concrete abutment—what were you doing that for? A. We were pulling the drift out to get them started with our driver on the east end. The Milwaukee was driving on the west end, and this drift was in the way of our first piles, and all we had to do was to pull the drift out and start our driver. We did not intend to do anything with the bridge at all until after we got the traffic across. * * * Q. They were driving the piles for the new temporary bridge? A. Yes, sir; they had one bent driven and were reaching out to get the next."

Later on the same witness testified that the purpose of removing the rubbish was to drive piles for a false work across, and that it was impossible to drive those piles without removing that rubbish. Now, such being the purpose and such the work under way, was the carrying on of the work an engagement in interstate commerce?

It has very recently been declared by the Supreme Court that the right to recover, under the Employers' Liability Act (35 Stat. 65, c. 149), arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employé is employed by

the carrier in such commerce. "The true test always is," says the court, "is the work in question a part of the interstate commerce in which the carrier is engaged." Pedersen v. Del., Lack. & West. R. R., 229 U. S. 146, 152, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153. The principle has been later reaffirmed. Ill. Cent. R. R. v. Behrens, 233 U. S. 473, 478, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163.

Does the case at bar fall within the principle? In the Pedersen Case, supra, the party seeking to recover and another employé, acting under the direction of the foreman, were carrying from a tool car to a bridge some bolts and rivets which were to be used by them in repairing the bridge, the repair to consist in taking out an existing girder and inserting a new one. The bridge could be reached only by passing over an intervening temporary bridge at another avenue. These bridges were each being regularly used, both in intrastate and interstate commerce. While carrying a sack of bolts or rivets over the temporary bridge on his way to the other bridge, the party suing was run down and injured by an intrastate passenger train. Passing upon this state of facts, the court said:

"We are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury. Among the questions which naturally arise in this connection are these: Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition, and efficiency of the commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency * * * in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce."

In Lamphere v. Oregon R. & Nav. Co., 196 Fed. 336, 116 C. C. A. 156, 47 L. R. A. (N. S.) 1, it was held that:

"A locomotive fireman in the employment of a railroad company engaged in interstate commerce, who was ordered by his superiors to report at a station to be transported with others to another station to relieve the crew of an interstate train, and who, when approaching the station over a crossing, was struck and killed through the negligence of other servants of the company, also operating an interstate train, was employed in interstate commerce at the time of his death within the meaning of the Employers' Liability Act."

And in Northern Pacific Ry. Co. v. Maerkl, 198 Fed. 1, 117 C. C. A. 237, another case in this court, it was held that:

"Where an employé of defendant, an interstate railroad company, was injured, in part through the negligence of a fellow servant, when working in repair shops connected with an interstate track, engaged in repairing a car used by defendant indiscriminately in both interstate and intrastate commerce as occasion required, defendant was at the time 'engaged in interstate commerce,' and the employé was employed by defendant in such commerce."

The analogy of the present case to these is sufficiently clear to impel us to the conclusion that the defendant was at the time of the accident engaged in interstate commerce in doing the work in hand, and that the plaintiff was employed in such commerce. To the inquiry of the court in the Pedersen Case: "Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier?"—we say here, with that court, "The answers are obvious."

[2] The defendant complains of the following instruction of the court as erroneous, and as affecting it injuriously, namely:

"The defendant in this case contends that the decedent assumed all the risks incident to the employment which were open and apparent, and under the evidence claims that the plaintiff cannot recover. You are instructed that, in an action prosecuted under the act of Congress upon which this action is predicated, the doctrine of assumption of risk does not apply to the extent that the employé assumes all the risks which are open, obvious, and apparent, whether the defendant was negligent or not. This act in question made the defendant liable for injuries resulting from negligence, and it does not make any exception at all. So in this case the decedent would be charged with the element of danger which this employment occasioned, and would assume the risks which were inherent in the employment and in the work, and which did not comprehend negligence on the defendant's part, and would not forego the right to recover damages caused by negligence on the part of the defendant."

Employers' Liability Act, § 3, provides:

"The fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé: Provided, that no such employé who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé."

And section 4 provides:

"Such employé shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé."

The court, in the case of Seaboard Air Line v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, having under consideration these two clauses of the statute, made this comment:

"It seems to us that section 4, in eliminating the defense of assumption of risk in the cases indicated, quite plainly evidences the legislative intent that in all other cases such assumption shall have its former effect as a complete bar to the action. And, taking sections 3 and 4 together, there is no doubt that Congress recognized the distinction between contributory negligence and assumption of risk; for, while it is declared that neither of these shall avail the carrier in cases where the violation of a statute has contributed to the injury or death of the employé, there is, with respect to cases not in this category, a limitation upon the effect that is to be given to contributory negligence, while no corresponding limitation is imposed upon the defense of assumption of risk—perhaps none was deemed feasible."

The phrase used in section 3, namely, "any statute enacted for the safety of employés," evidently has reference to the federal statutes, such as the Safety Appliance Act (Act March 2, 1893, c. 196, 27 Stat. 531 [Comp. St. 1913, §§ 2605–8612]), the Hours of Service Act (Act March 4, 1907, c. 2939, 34 Stat. 1415 [Comp. St. 1913, §§ 8677–8680]), and the like, and the negligence referred to must be in violation of such statutes, and does not apply to negligence generally.

In this same case the court reaffirmed the principle of the common law respecting the doctrine of assumption of risk, which the following declaration indicates:

"When the employé does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employé assumes the risk, even though it arise out of the master's breach of duty."

The interpretation of the statute here declared is reaffirmed in the case of Southern Ry. Co. v. Crockett, 234 U. S. 725, 730, 34 Sup. Ct. 897, 899 (58 L. Ed. 1564) where the court says:

"Upon the merits, we of course sustain the contention that by the Employers' Liability Act the defense of assumption of risk remains as at common law, saving in the cases mentioned in section 4; that is to say: 'Any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé.'"

The jury was instructed in the present case, in effect, that under the Employers' Liability Act of Congress the defendant would be rendered liable for injuries resulting from its negligence, and that to this rule there is no exception. So it was concluded that the decedent was, chargeable with the element of danger which his employment occasioned, and assumed the risks which were inherent in his employment and work, but that these did not comprehend negligence on the part of the defendant, and that he would not thereby forego the right to recover damages caused by negligence on the part of the defendant. In other words, the jury was left to infer that, if the defendant were guilty of any negligence at all, or any kind of negligence, contributing to the injury, then the decedent assumed none of the risks incident to his employment.

Such is not the law, in view of decisions above cited. The assumption of risk is eradicated only in case the employer is negligent in the violation of some statute enacted for the safety of employés. In other negligence the rule remains as at common law.

Other questions are reserved, but they may not arise again on a new trial, and hence we omit their consideration for the present.

The judgment is reversed, and the cause will be remanded for a new trial.