## EMMA F. NASH v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY.[1]

November 19, 1915.

Nos. 19,423—(87).

**Federal Employer's Liability Act.**

1. The depots of a railway company engaged in interstate commerce constitute a part of the equipment of the company used in such commerce. An outhouse at a depot is a mere appendage thereto; and a crew engaged in transporting a new one to a depot already in use for interstate traffic, for the purpose of installing it to take the place of an old one previously erected at such depot, is within the protection of the Federal Employer's Liability Act.

**Damages excessive — new trial on condition.**

2. The facts in this case do not warrant a verdict for the amount returned by the jury, and a new trial is granted, unless plaintiff shall consent to reduce the verdict to the sum of $12,000.

Action in the district court for Ramsey county by the administratrix of the estate of John Everett Nash, deceased, to recover $25,000 for the death of her intestate from injuries received while in the employ of defendant, and $125 for funeral expenses. The case was tried before Hanft, J., who when plaintiff rested denied defendant's motion to dismiss the action, and a jury which returned a verdict for $18,000. From

[1]Reported in 154 N. W. 957.

Note.—As to when servant is engaged in interstate commerce so as to come within protection of Federal employers' liability act, see notes in 47 L.R.A.(N.S.) 52; and L.R.A. 1915C, 47.

As to measure of damages in action for death under employers' liability act, see note in 47 L.R.A.(N.S.) 80.

an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed.   Affirmed on condition.

W. H. *Bremner* and F. M. *Miner,* for appellant.

*Barton & Kay,* for respondent.

TAYLOR, C.

John Everett Nash was a member of a crew, in defendant's bridge and building department, which performed carpenter work and made repairs on the bridges and buildings on defendant's branch line of railroad extending from Marshalltown in the state of Iowa to Story City in the same state.   This crew had constructed a number of small outhouses at Marshalltown which were kept in stock ready to be erected wherever needed. They were directed to install one of these outhouses at the station of St. Anthony on this branch line, to take the place of the old outhouse then at that station.   They loaded it upon a car to be transported by train to St. Anthony, but, on the way there, it fell off the car upon the ground and was broken in pieces.   On the next day, the crew went out on a hand car, propelled by a gasolene engine, to pick it up.   They procured a small push car upon which they loaded it, and then pushed this car in front of the hand car to a siding where they ran it upon a side-track to wait for a train to pass.   While waiting, the foreman, who had not previously been with them, arrived on a "speeder."   He had learned that the train for which they were waiting was late and directed them to proceed to St. Anthony.   To start the gasolene engine which propelled the hand car, they pushed the car along the track until the gas ignited and thereby set the engine in operation.   The engine did not work properly at this time, and the foreman left his speeder and assisted the men in pushing the car in order to start it.   It started, then stopped, and they began pushing it again.   In this manner they had moved the car between 100 and 200 feet from the speeder, when a member of the crew, without the knowledge of the foreman or other members of the crew, went back, mounted the speeder and started it.   He either did not know how to stop the speeder, or, from some unexplained cause, was unable to do so.   When he saw that a collision was imminent, he shouted to the men at the hand car and all except Nash got out of the way.   Nash was caught between the speeder and the hand car and received injuries from which he sub-

sequently died. Plaintiff, his widow, was appointed adminstratrix of his estate, and brought suit for damages on behalf of herself and the two children, respectively three and five years of age, under the Federal Employer's Liability Act. The jury returned a verdict for $18,000, apportioned $8,000 to the widow and $5,000 to each of the two children. Defendant made the usual alternative motion for judgment notwithstanding the verdict or for a new trial, and appealed from the denial of this motion.

Two questions are presented: Whether Nash, at the time of the accident, was engaged in interstate commerce within the meaning of the Federal Employer's Liability Act; and whether the verdict was excessive.

1. Defendant was engaged in interstate commerce. The crew, of which Nash was a member, performed their duties wholly in the state of Iowa. The outhouses had been constructed and were kept in stock in the state of Iowa. The outhouse in question had been loaded upon a train in the state of Iowa to be transported to another station in that state, for the purpose of being installed at such station and of taking the place of the old outhouse previously erected there. The station buildings and the outhouses connected therewith are provided for the accommodation of interstate as well as intrastate passengers, and are unquestionably used in connection with interstate commerce. Whether the outhouse in question had been sufficiently appropriated to the uses of interstate commerce, at the time of the accident, so that those engaged in handling it were engaged in such commerce, must be determined by the Federal law and the construction given to that law by the Federal courts.

In the following cases, employees, injured while employed in the manner indicated, were held to have been engaged in interstate commerce at the time of the injury:

A workman carrying bolts to a bridge, over which interstate trains passed, to be used in repairing such bridge. Pedersen v. Delaware, L. & W. R. Co. 229 U. S. 146, 33 Sup. Ct. 648, 57 L. ed. 1125, Ann. Cas. 1914C, 153.

A truckman wheeling interstate freight from a warehouse and loading it into a car for transportation to another state. Illinois Cen. R. Co. v. Porter, 207 Fed. 311, 125 C. C. A. 55.

A brakeman who was injured while two intrastate cars were being uncoupled from the engine of an interstate train which had taken them from such train and run them upon a side track. New York Cent. & H. R. R. Co. v. Carr, 238 U. S. 260, 35 Sup Ct. 780, 59 L. ed. 1298.

A carpenter engaged in constructing a new office in a freight shed. Eng v. Southern Pac. Co. (D. C.) 210 Fed. 92.

A carpenter engaged in repairing a roundhouse which had been damaged by fire to such an extent that it was temporarily out of use. Thomas v. Boston & M. R. R. 219 Fed. 180, 134 C. C. A. 554.

A workman employed in constructing a temporary bridge to enable the company to move traffic while repairing the permanent bridge which had been damaged by a freshet. Columbia & P. S. R. Co. v. Sauter, 223 Fed. 604, 139 C. C. A. 150.

A workman engaged in setting poles and stringing wires for the purpose of installing a system of block signals. Saunders v. Southern Ry. Co. 167 N. C. 375, 83 S. E. 573; Grow v. Oregon Short Line Ry. Co. 44 Utah, 160, 138 Pac. 398, Ann. Cas. 1915B, 481.

A switchman engaged in moving a car of oil intended for use on both switch engines and interstate engines. Montgomery v. Southern Pac. Co. 64 Ore. 597, 131 Pac. 507, 47 L.R.A. (N.S.) 13.

An hostler's helper engaged in coaling an engine then being prepared to haul interstate freight. Armbruster v. Chicago, R. I. & P. Ry. Co. 166 Iowa, 155, 147 N. W. 337.

A workman wheeling a barrow of coal for use in the heating stoves of a repair shop, where cars which had been in interstate commerce and were to be returned to such commerce were being repaired. Cousins v. Illinois Cent. R. Co. 126 Minn. 172, 148 N. W. 58.

In the following cases employees, injured while employed in the manner indicated, were held not to have been engaged in interstate commerce at the time of the injury:

A fireman upon a switch engine moving intrastate cars from one point in the city to another point in the same city, although the same engine and crew moved interstate cars both before and after moving the cars in question. Illinois Cent. Ry. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. ed. 1051, Ann. Cas. 1914C, 163.

A miner injured by an explosion in a coal mine, the coal from which was intended for use in defendant's locomotives while hauling interstate trains. Delaware, L. & W. R. Co. v. Yurkonis, 238 U. S. 439, 35 Sup. Ct. 902, 59 L. ed. 1397.

A workman employed in the construction of a bridge upon a cut-off more than a mile in length upon which the rails had not yet been laid. Bravis v. Chicago, M. & St. P. Ry. Co. 217 Fed. 234, 133 C. C. A. 228.

A workman engaged in the construction of a tunnel upon a cut-off which, when completed, was intended to be used in interstate commerce. Jackson v. Chicago, M. & St. P. Ry. Co. (D. C.) 210 Fed. 495.

An assistant gardener employed to cultivate the yard about a railway station and gather refuse and burn it. Galveston, H. & S. A. Ry. Co. v. Chojnacky (Tex. Civ. App.) 163 S. W. 1011.

In the Pedersen case the court said: "Among the questions which naturally arise in this connection are these: Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair." The court further said: "A track or bridge may be used in both interstate and intrastate commerce, but when it is so used, it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce.

"The point is made that the plaintiff was not at the time of his injury engaged in removing the old girder and inserting the new one, but was merely carrying to the place where that work was to be done some of the materials to be used therein. We think there is no merit in this. It was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work."

In the Bravis case the court said: "The Federal Employer's Liability Act protects only those employed in interstate commerce. Those em-

ployed in the preparation or construction of roadbeds, rails, ties, cars, engines, and other instrumentalities which are intended for use in interstate commerce, but have never been and are not in use therein, are not employed in interstate commerce, and are not protected by that act."

In the Eng case the court said: "Freight sheds, depots, and warehouses or other facilities provided and used by a carrier for receiving, handling, and discharging interstate freight are, I take it, instrumentalities used in interstate commerce under the doctrine of the cases, and are so closely connected therewith as to be a part thereof for the purpose of the Federal Employer's Liability Act. Claim is made that, since plaintiff at the time of his injury was at work in framing a new office in the freight shed, he is in the position of one employed to construct buildings, tracks, engines, or cars, which have not yet become instrumentalities of commerce. But the freight shed in question was being so used by the defendant in its interstate business. The work in which the plaintiff was engaged, as appears from the complaint, was in the nature of the repair of an instrumentality so used, and not the construction of new work."

In the instant case, the old outhouse, for which the one in question was to be substituted, was a mere appendage to defendant's station building or depot. This depot was used in interstate commerce; and replacing the old closet by a new one was rather in the nature of repairs to the station accommodations provided for the use of the traveling public, than the installation and erection of a new and independent structure. The crew had placed it upon a train, for the purpose of having it conveyed to St. Anthony, where they were to install it. It had fallen from the train, and, at the time of the accident, they were engaged in conveying it from the place where it fell to St. Anthony. We fail to find any substantial distinction between this case and the Pedersen case. In that case, bolts and rivets were being carried to a bridge for use in constructing a new girder to replace an old one. In the instant case, the outhouse was being conveyed to a depot already in use, for use in connection therewith. Under the doctrine of the cases, we think the facts and circumstances brought Nash within the protection of the act. See the exhaustive note in which the cases are collected and analyzed, found in 47 L.R.A. (N.S.) at page 38, and especially the seventh subdivision thereof beginning on page 52.

2. The earnings of Nash while at work for the railway company do

not appear. He was 35 years of age and had been married about seven years. After his marriage, he worked as stock clerk for a wholesale grocery house for about six months at $55 per month; he was then transferred to the bookkeeping department and worked there for about a year at $70 to $75 per month. After this he worked as a farm laborer for over two years at $40 to $50 per month, and during some of this time was also furnished a house in which to live, together with fuel and milk. Immediately before beginning work for the railway company, he worked for a delivery company at $45 per month. This comprises all the information we have as to his earning capacity.

If the action had been brought under our state law, the amount of recovery would have been limited to the sum of $7,500; but this limitation does not apply to actions brought under the Federal law. The amount of recovery in such actions, however, while left largely to the judgment of the jury, must not exceed the pecuniary benefits which his family could reasonably expect to have received from the deceased if he had remained alive. Interest at the rate of six per cent per annum upon the amount of the verdict in the instant case would produce an income of $1,080 per year, or $90 per month, a larger amount than the deceased had ever earned, and nearly double the amount he was earning during the last three years of the time for which his earnings are given. The interest at the rate of six per cent upon $12,000 would produce $720 per year, or $60 per month, and still leave the principal intact. The law does not contemplate the recovery of a sum, the interest upon which will afford the family an income equivalent to the pecuniary benefits which they might expect from the deceased if he had continued to live; but limits the recovery to a sum which would procure an annuity, equivalent to such pecuniary benefits, for the period covered by the life expectancy of the deceased. It must also be borne in mind, in determining the loss sustained, that the portion of his earnings which the deceased, if living, would expend upon himself for his own maintenance cannot be included therein.

The facts shown in the record do not warrant a verdict in the amount returned. If, within ten days after the filing of the remittitur in the court below, the plaintiff shall file a written consent that the verdict be reduced to the sum of $12,000, to be divided between the widow and

children in the same proportion that the jury divided the original verdict, the order appealed from is affirmed; if such consent be not so filed, the order appealed from is reversed and a new trial granted.